Filed 1/14/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | B255727 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. Nos. MA057051, |
| v. | MA058872 &3AV06372) |
| RENOIR VINCENT VALENTI, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Renoir Vincent Valenti was convicted of continuous sexual abuse, lewd act on a child, child molestation, forgery, and violating a court order—all relating to his sexual abuse of 15 children over nearly 30 years. The jury found multiple-victim and substantial-sexual-conduct allegations true.

On appeal, defendant contends there is insufficient evidence his continuous sexual abuse of Denzel lasted at least three months or that he touched Jeremy or Bradley with lewd intent; that we must reverse his six convictions for annoying or molesting a child because there is insufficient evidence of objectively disturbing or offensive conduct, the court erred by instructing the jury the People did not have to prove sexual motive, and the instruction for those offenses misstated the law; and that the court erred by failing to instruct the emotional support person not to influence the witnesses. Defendant also contends his conviction for lewd act on Alexis is unauthorized; his consecutive one-strike sentences are unauthorized and an abuse of discretion; and the noneconomic restitution awards are unauthorized and unconstitutional.

We affirm in part, reverse in part, and remand with directions. We reverse the convictions for counts 1, 5, and 10 for insufficient evidence, and count 14 for violating the Ex Post Facto Clause; those counts may not be retried. We reverse the convictions for counts 6 through 9 for failure to instruct on an element of the offense, and remand for retrial. We vacate the indeterminate sentences imposed for counts 2 and 12, and remand for resentencing without application of the One Strike Law. We reverse the noneconomic restitution awards for all counts, and remand with directions to conduct a restitution hearing for counts 15, 23, and 24 only. We direct the court, upon resentencing, to recalculate defendant's custody credit to reflect no more than 15 percent local conduct credit. In all other respects, we affirm.

**PROCEDURAL BACKGROUND**

Defendant was charged by fourth amended information with 20 counts related to the sexual abuse of children who lived in his neighborhood and played on the soccer teams he coached. The information charged him with five counts of continuous sexual

abuse, a felony (Pen. Code,[1] § 288.5; counts 1 [Denzel M.], 2 [Garrett M.], 12 [Cory D.], 13 [Ammon C.], and 20 [Thomas C.]); three counts of lewd act on a child younger than 14, a felony (§ 288, subd. (a); counts 15 [Jeremy S.], 23 [Justin B.], and 24 [Bradley T.]); one count of lewd act upon a 14- or 15-year-old child by a person more than 10 years older, a felony (§ 288, subd. (c)(1); count 14 [Alexis K.]); six counts of annoying or molesting a child, a misdemeanor (§ 647.6, subd. (a)(1); counts 5 [Ricardo S.], 6 [Larry S.], 7 [Hunter S.], 8 [Wyatt S.], 9 [Richard S.], and 10 [David S.]); four counts of recording a false or forged instrument, a felony (§ 115, subd. (a); counts 16–19); and one count of violating a court order, a misdemeanor (§ 166, subd. (a)(4); count 21).[2]

As to the charges of continuous sexual abuse (§ 288.5; counts 1–2, 12–13, and 20), the information alleged the crimes involved substantial sexual conduct with a child younger than 14 (§ 1203.066, subd. (a)(8)) and defendant committed the offense against

---

[1]    All undesignated statutory references are to the Penal Code.

[2]    Defendant was ultimately tried for twenty counts, numbered 1–2, 5–10, 12–21, and 23–24. Counts 1–19 were charged in the original information, filed October 15, 2012. On October 24, 2013, the first amended information added counts 20 and 21. Count 20 had originally been charged as count 1 in case no. MA058872, filed April 9, 2013. That case was consolidated into this case on May 23, 2013. Counts 21 and 22 were duplicates. On September 26, 2013, defendant was charged with one count of violating a court order (§ 166, subd. (a)(4)) in case no. 3AV06372. On October 24, 2013, the People filed a first amended information, charging that crime, violating a court order, as count 21 in this case. On December 16, 2013, case no. 3AV06372 was consolidated into case this case as count 22. The same day, the People amended the information in this case to reflect the consolidation. On January 4, 2014, the People dismissed count 22 as duplicative of count 21. The dismissal is reflected in the third amended information, filed January 27, 2014, which does not contain a count 22.

On February 11, 2014, the People filed the fourth amended information, the operative pleading in this case, which added counts 23 (§ 288, subd. (a); Justin) and 24 (§ 288, subd. (a); Bradley). The People then dismissed counts 3 (§ 647.6, subd. (a)(1); Jeremy), 4 (§ 647.6, subd. (a)(1); Bradley), and 11 (§ 288.5; Justin) under section 1385. The summary page of the fourth amended information reflects the dismissals, but the body of the information does not.

3

more than one victim (§ 667.61, subds. (b), (c), (e)(4)). As to the charges of lewd act on a child (§ 288, subds. (a), (c); counts 14–15, 23–24), the information alleged defendant committed the offense against more than one victim (§ 667.61, subds. (b), (c), (e)(4)).[3]

Defendant pled not guilty and denied the allegations. A jury found defendant guilty of all remaining counts, and found all allegations true.

The court sentenced defendant to a determinate term of 10 years and eight months, and a consecutive, indeterminate term of 120 years to life. For the determinate sentence, the court selected count 14 (§ 288, subd. (c)(1)) as the base term, and imposed the upper term of three years.[4] The court imposed consecutive one-year terms for counts 5 through 10 (§ 647.6, subd. (a)(1)) and 21 (§ 166, subd. (a)(4)), for a total of seven years. The court imposed eight months—one-third the middle term of two years—for count 16 (§ 115, subd. (a)), to run consecutive, and the middle term of two years for counts 17, 18, and 19 (§ 115, subd. (a)), to run concurrent with the principal term. For the indeterminate sentence, the court imposed eight consecutive terms of 15 years to life for counts 1, 2, 12, 13, and 20 (§ 288.5) and counts 15, 23, and 24

[3]　In 2010, the One Strike Law (§ 667.61) was amended and partially renumbered. (Stats.2010, ch. 219 (A.B.1844), § 16.) Before the amendment, the multiple-victim allegation appeared in subdivision (e)(5). (Stats.2006, ch. 337 (S.B.1128), § 33.) The amended statute moved the allegation to subdivision (e)(4). (Stats.2010, ch. 219 (A.B.1844), § 16.) The original information, filed October 15, 2012, correctly charged the multiple-victim allegation as a violation of section 667.61, subdivision (e)(4), under the then-current version of the statute. However, the fourth amended information, filed February 11, 2014, mistakenly charged the multiple-victim allegation under subdivision (e)(5). After the 2010 amendment, subdivision (e)(5) read: "(5) The defendant engaged in the tying or binding of the victim or another person in the commission of the present offense." (Stats.2010, ch. 219 (A.B.1844), § 16.) The (e)(5) allegation appears to be a scrivener's error that was carried over to the verdict forms and related minute orders. Based on the record, defendant acknowledges he had notice of the intended charge—the multiple-victim allegation set forth in section 667.61, subdivision (e)(4)—and waives any error.

[4]　Because the offense was committed before the effective date of the One Strike Law (§ 667.61, subds. (b)–(e)), the court determined the Law's indeterminate sentencing provisions did not apply to count 14.

(§ 288, subd. (a)) under the One Strike Law (§ 667.61, subds. (c), (i)). Defendant was ordered to pay fines and assessments totaling $36,490, and restitution for noneconomic damages (§ 1202.4, subd. (f)(3)(F)) totaling $450,000. Defendant received 1,241 days pretrial custody credit—621 days actual credit and 620 days local conduct credit.

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

In 1983, eight-year-old James K. met defendant at the Santa Monica Pier. James liked to break dance with his friends in Santa Monica and Venice while his father fished nearby. James approached defendant, who was photographing the break dancers, and asked defendant to take pictures of James and his friends, who were hoping to book a commercial. Defendant and James began to spend time together and soon, James's 10-year-old sister, Alexis, asked to come along.

By 1986, defendant and Alexis had started dating. Alexis was 13 years old; defendant was 24. They married the following year, on August 11, 1987. In 1991, Alexis gave birth to the couple's first child, Damien. In 1993, the young family moved to Palmdale. Defendant told people his name was Renoir Vincent Valenti,[5] and that he was a soccer coach from England. In early 1994, Alexis gave birth to the couple's second child, Alex.

In 1995, defendant's sons introduced him to Garrett, a five-year-old boy who lived in the same apartment complex as the Valenti family. Defendant soon started molesting Garrett. The abuse, which continued for nearly a decade, ultimately involved thousands of episodes of molestation, including repeated oral copulation, masturbation, and sodomy.

The same year, defendant began to coach boys' soccer in Lancaster. He would go on to coach Lancaster soccer from 1995 until 2006—primarily coaching teams of boys younger than 10 or 12 years old.

---

[5]     Although he introduced himself as Renoir Valenti, defendant's legal name is Raynard Anthony Haylock.

Meanwhile, Alexis had grown unhappy in her marriage to defendant and jealous of the time he spent with other people's children. They separated on March 30, 1996; a judgment of dissolution was entered on January 6, 1997. Despite the divorce, Alexis and defendant continued to live together, and in April 1998, they moved to the nearby Pavilion Apartments. Justin and Gary Q. lived in the complex.

In 1998, defendant's apartment was "the place to be" for neighborhood boys like Justin, Garrett, and Gary. He had stocked it with big screen televisions, video games, food, and candy. Defendant also took Justin and his friends to the desert to shoot BB guns. On the way, the boys took turns sitting on defendant's lap to steer the car. When Justin sat in his lap, defendant usually became aroused, and Justin felt him get an erection. Sometimes, defendant also rubbed Justin's inner thigh. On June 17, 1998, Justin's mother reported defendant to the police for child molestation. Defendant was arrested on June 28, 1998, but the case was dismissed for insufficient evidence.

By 2001, defendant and Alexis had moved from Palmdale to an apartment in Lancaster. That year, defendant met Cory. Like Garrett, whose abuse continued during this period, Cory often spent the night at defendant's home. Defendant frequently hugged Cory, kissed him on the forehead and lips, and inserted his tongue into Cory's mouth. One evening, defendant brought Cory to his bedroom and fondled his penis.

In 2001 or 2002, Alexis finally moved out, leaving Damien with his father, defendant. On January 31, 2003, Damien reached out to the Sheriff's Department. He told authorities defendant had been beating and molesting him for five years, along with Garrett, Cory, and a boy named David. Sergeant Anna Fernandez investigated the allegations, but no charges were ever filed. Damien later recanted.

Before long, defendant had moved on to Ammon. Ammon met defendant through his older brother, a friend of Damien's and a member of the soccer team defendant coached. Soon, Ammon joined the soccer team too. By 2004, eight-year-old Ammon had started sleeping over at defendant's house nearly every weekend—and defendant molested him on nearly every visit. During those visits, defendant touched

6

Ammon's penis, put his mouth on Ammon's penis, and masturbated Ammon and himself.

Ammon met Thomas in the fall of 2005, when they sat together in fourth grade. In early 2006, defendant moved west to Quartz Hill. Sometime that winter or spring, Ammon introduced Thomas to defendant. Thomas was nine years old. Thomas went to defendant's house two or three times each week until 2007, when he was scheduled to start sixth grade. Every time Thomas visited defendant, defendant sat Thomas on his lap, reached his hand into Thomas's pants, and stroked his penis and buttocks. Defendant put his fingers around Thomas's anus and kissed his neck. The abuse continued as long as Thomas spent time at defendant's house.

In the summer of 2007, Thomas failed fifth grade, and Ammon moved to Bakersfield for sixth grade. For Thomas, the abuse ended when Ammon moved away in 2007, and he stopped visiting defendant. Ammon's abuse did not end, however. Despite living in Bakersfield, Ammon continued to see defendant. In 2008, when Ammon moved back to Lancaster for seventh grade, he joined defendant's Manchester United soccer team, and resumed his frequent visits to defendant's house.

Meanwhile, brothers Enrique, Eduardo, and David had also joined Manchester soccer. Along with their younger brother Ricardo, they began sleeping over at defendant's house nearly every weekend before their soccer games. During their weekends with defendant, the brothers played soccer and video games, and defendant took them to the movies, out to eat, and to amusement parks like Universal Studios, Hurricane Harbor, Six Flags, and Magic Mountain. While defendant bought gifts for some boys—like RC cars[6] worth hundreds of dollars—he did not buy gifts for Enrique, Eduardo, David, or Ricardo. He did, however, pay their soccer registration fees.

Defendant applied to coach soccer in Quartz Hills beginning in 2007, and was assigned a team for the 2010 season. That summer, Manchester soccer disbanded, and defendant began coaching the Red Devils—the soccer team he would coach through the

---

[6]     An RC car is a remote control car.

7

2010–2011 regular and all-star seasons. Ammon joined another soccer team; he stopped going to defendant's house, and the abuse ended. Enrique, Eduardo, and David followed defendant to the Red Devils, where thirteen year-old Jeremy would become defendant's star player and the main focus of his attention.

Jeremy met defendant at the 2010 soccer tryouts. He sometimes visited defendant's house with the other boys, but mostly, defendant went to Jeremy's house, where he spent a lot of time with Jeremy's family. Defendant played basketball with Jeremy, his dad, and his brother; he played video games with them; he joined the family for dinner and for his birthday. Sometimes Jeremy's friend Bradley was there too. Defendant, Jeremy, and Bradley went on adventures together—to the RC car racing track, Mulligan Family Fun Center, or out to eat. For Christmas, defendant made Jeremy a large photo collage, created a photo calendar, and bought him an Xbox. Sometime after that, he bought Jeremy a $600 RC car. Defendant's nightstand sported a matted, framed photo of Jeremy, with the phrase "all the numbers" written on the mat. "All the numbers" was an expression of defendant's love for Jeremy, and defendant frequently told Jeremy he loved him. Defendant also showed his love in other ways. He cuddled with Jeremy on the couch, kissed him, held his hand in the car, sat Jeremy on his lap to steer the car, and hugged him for inappropriately long periods. Defendant also spent time with Jeremy at Bradley's house, where he swam with the boys in the pool. In 2011, defendant's relationship with Jeremy's family soured when he took Jeremy to Littlerock Dam without the family's permission. Though defendant begged for forgiveness, Jeremy's family would no longer let defendant see their son. However, Jeremy continued to send defendant text messages; once, he asked defendant to bring him food and donuts; another time, he asked for $20.

Meanwhile, sometime during this period, Ammon moved to Nevada. Before he moved away, defendant delivered a letter to Ammon's mother. "Hello son," he wrote, "I thought that I would get to see you grow up and graduate from middle school and high school, teach you to drive, get you a car and see you off to college; however, it

8

seems, this is not to be. . . . I have and will always miss you every day, yesterday and forever. I will never forget my Ammon. . . . I will always love you all the numbers."

When the next soccer season began in August 2011, defendant had been banned from coaching boys' soccer in Palmdale, Lancaster, and Quartz Hills. In Palmdale and Quartz Hills, defendant had tried to register boys to play soccer without their parents' consent; the reasons for the Lancaster decision were not disclosed to the jury. By this time, Ammon had moved away and Jeremy was off-limits, so defendant directed his energies towards Bradley, repeating the pattern that had worked so many times before. By May or June 2012, however, Bradley's mother had ordered him to stop seeing defendant. Bradley asked his father, James T., for permission—but James insisted on interviewing defendant first. At their meeting, defendant told James that "his children were grown and he liked hanging out with younger children." James responded, "It wasn't going to happen then or at any time." Bradley continued to contact defendant by text message—but eventually, Bradley's mother found out and grounded him. Now Bradley, too, was off-limits. But Eduardo, Enrique, Ricardo, and David still spent the weekends at defendant's house—a house full of fun things for boys to do—and defendant moved on to children in his neighborhood.

Nine-year-old Denzel, his older brother Gareth, and their mother, Monique, were defendant's next-door neighbors in Quartz Hills. In January 2012, Gareth started spending time at defendant's house with Enrique and Eduardo. Eventually, Denzel joined him. Denzel usually played outside with the neighborhood kids. By May 2012, however, Denzel had started spending more time inside defendant's house, playing video games, watching movies, and eating pizza. By June 2012, defendant was a well-established presence in Denzel's life. Sometime that summer, defendant called Denzel into his bedroom and began to molest him. Defendant would call Denzel into his bedroom, close the door, and lift him onto the bed. Then, using his hand, defendant rubbed Denzel's penis through his clothes. Other times, defendant sucked "around my wiener area," again through Denzel's clothes. DNA tests confirmed the presence of defendant's saliva on Denzel's shorts.

9

In late June 2012, Larry, Richard, and twin brothers Hunter and Wyatt ("Rachel's sons") met defendant through their friend Denzel. Rachel arrived at Denzel's house one day to pick up him up for a sleepover with the twins; she was chatting with Monique when defendant came over to introduce himself. Defendant picked Denzel up the following day, and began turning up at Rachel's house whenever Denzel was there. On July 10, 2012, defendant appeared uninvited at a family birthday party for Rachel's nephew. The following day, Denzel told Monique that defendant had been molesting him. On July 12, 2012, Monique reported defendant to the police, and no longer allowed him to have contact with Denzel. At that point, defendant dramatically increased the attention he paid to Rachel's sons.

Cut off from Denzel, defendant started showing up at Rachel's house almost every day. As with the previous objects of his affection and abuse, defendant and Rachel's sons played video games and basketball, and raced RC cars. He took the boys to the movies, to Mulligan's, to the desert to shoot Airsoft pistols, and to the local pool. He put them in his lap and let them steer the car. This time, however, his conduct escalated quickly. Defendant tried to see the boys every day. He appeared at the house uninvited—or invented a pretext to come over even when Rachel specifically told him not to. He called the house to wish the boys goodnight, and asked Rachel to tell them that he missed them, and that he loved them. Within weeks, defendant had overstayed his welcome.

Finally, on August 6, 2012, authorities took defendant into custody.

## CONTENTIONS

On appeal, defendant contends that count 14 (§ 288, subd. (c)(1); Alexis) was barred by the statute of limitations, supported by insufficient evidence, based on conduct that did not violate the statute, and based on sexual intercourse with his lawful wife; that there was insufficient evidence the continuous sexual abuse in count 1 (§ 288.5; Denzel) lasted more than three months; that there was insufficient evidence of lewd intent to support counts 15 and 24 (§ 288, subd. (a); Jeremy and Bradley); that in counts 5 through 10 (§ 647.6, subd. (a)(1); Ricardo, Larry, Hunter, Wyatt, Richard, and

10

David), there was insufficient evidence of an objectively disturbing act, the court improperly instructed the jury the prosecution did not have to prove motive, and CALCRIM No. 1122 misstates the law; that the court prejudicially erred by failing to instruct the emotional support person not to "prompt, sway, or influence the witness in any way"; that the court did not understand it had the discretion under the One Strike Law to impose concurrent life sentences for the convictions obtained for counts 1, 2, 12, 13, 15, 20, 23, and 24 (§ 667.61, subds. (b)-(e); Denzel, Garrett, Cory, Ammon, Jeremy, Thomas, Justin, and Bradley); that the award of noneconomic restitution (§ 1202.4, subd. (f)(3)(F)) to the victims of continuous sexual abuse charged in counts 1, 2, 12, 13, and 20 (§ 288.5; Denzel, Garrett, Cory, Ammon, and Thomas) is unauthorized by statute; and that the entire noneconomic restitution award is unsupported by substantial evidence or a rational method of calculation, violates the Sixth Amendment, irrationally distinguishes between two groups of child predators in violation of the Equal Protection Clause, and violates the right to a civil jury trial under the California Constitution. In response, the People agree the conviction for count 14 (§ 288, subd. (c); Alexis) should be reversed, but only because it violates the Ex Post Facto Clause.

By letter, we invited the parties to file supplemental briefing on the issue of whether application of the One Strike Law to the sentences for counts 2, 12, 13, and 20 violated the Ex Post Facto Clause. In response, the People and defendant agree that the one-strike sentences for counts 2 and 12 violate the Ex Post Facto Clause, and defendant contends his sentences for counts 13 and 20 also violate the Ex Post Facto Clause.

## DISCUSSION

**1. Sufficiency of the Evidence of Continuous Sexual Abuse of Denzel (Count 1) and Lewd Intent Toward Jeremy and Bradley (Counts 15 and 24)**

Defendant contends we must reverse the conviction for count 1 (§ 288.5; Denzel) because the evidence was insufficient to establish the abuse lasted at least three months, and that we must reverse the convictions for counts 15 and 24 (§ 288, subd. (a); Jeremy and Bradley) because the evidence was insufficient to establish sexual intent.

11

In assessing the sufficiency of the evidence, we review the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.) In applying this test, we review the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The testimony of a single witness can be sufficient to uphold a conviction—even when there is significant countervailing evidence, or the testimony is subject to justifiable suspicion. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) Accordingly, we may not reverse for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## 1.1 There is insufficient evidence the continuous sexual abuse of Denzel (count 1) lasted at least three months.

A violation of section 288.5 requires proof of the following elements:

1. The defendant lived with *or* had recurring access to a child;

2. The defendant engaged in three or more acts of substantial sexual conduct *or* lewd or lascivious conduct with the child;

3. Three or more months passed between the first and last acts; and

4. The child was younger than 14 years old at the time of the acts.

(*People v. Rodriguez* (2002) 28 Cal.4th 543, 550 [statute "requires at least three acts of sexual misconduct with the child victim over at least three months to qualify for prosecution of persons who are either residing with, or have 'recurring access' to, the

12

child."]; *People v. Vasquez* (1996) 51 Cal.App.4th 1277, 1284–1285 [at least three months between first and last act of abuse].)

"[T]he prosecution need not prove the exact dates of the predicate sexual offenses in order to satisfy the three-month element. Rather, it must adduce sufficient evidence to support a reasonable inference that at least three months elapsed between the first and last sexual acts. Generic testimony is certainly capable of satisfying that requirement . . . [but] 'the victim must be able to describe *the general time period* in which these acts occurred (e.g., "the summer before my fourth grade," or "during each Sunday morning after he came to live with us"), to assure the acts were committed within the applicable limitation period.' [Citations.] That is, while generic testimony may suffice, it cannot be so vague that the trier of fact can only speculate as to whether the statutory elements have been satisfied." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 97 (*Mejia*).)

Defendant was charged with continuous sexual abuse of Denzel "[o]n or between January 1, 2012 and July 11, 2012[.]" The testimony established that Denzel's older brother, Gareth, began spending time at defendant's house sometime in January 2012, six months before their mother, Monique, reported defendant to the police on July 12, 2012. Denzel first met defendant sometime after that, when he went next door to bring Gareth home. Denzel told defendant he was there to pick up his brother; he did not go inside the house. Denzel next went to defendant's house "a long time later"—again, to pick up Gareth. As on the first visit, he did not go inside. This is consistent with Monique's account: "In the beginning [Denzel] would go by himself to play outside out in the front yard and practice soccer . . . . [H]e would go outside. Renoir spent most of his time in the driveway and in the garage with the garage door open. So [Denzel] would go outside and Renoir had a bag of soccer equipment right there by the garage door, and the neighborhood kids felt free to come up enough that they would come and play. So my son would do that and he would play in the grass in the front yard." However, it is unclear when Denzel started playing outside defendant's house or how long this period lasted.

13

"[A] long time" after the second visit, Denzel went to defendant's house again. He accompanied Gareth, and that time, he went inside; he stayed for about an hour, played video games, and went home. "A couple weeks" after that, Denzel returned for a fourth visit, again with his brother. At first, Denzel's visits were short, and always at times when other kids were there too; he went inside to play video games, watch movies, and eat pizza. By May 2012, Denzel had started spending more time inside defendant's house. However, it was not until sometime that summer, "a couple months" after his fourth visit, that defendant called Denzel into his bedroom and began to molest him.

"Presuming in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence, we find no reasonable, credible, solid evidence to support a nonspeculative inference that the three-month minimum time period element was satisfied." (*Mejia*, *supra*, 155 Cal.App.4th at p. 94.) "[A]lthough there was ample evidence that at least three sexual qualifying offenses occurred during the charging period" (*id.* at p. 95), there is no evidence that at least one of those offenses occurred before April 11, 2012—three months before the last possible incident. The evidence established Denzel briefly met defendant sometime after mid-January 2012. "A long time later," Denzel briefly met defendant a second time. A "long time" after that, Denzel went inside defendant's house for an hour to play video games. "A couple weeks" later, Denzel went back for another uneventful visit. After another "couple months," sometime during the summer, defendant molested Denzel for the first time. Witness testimony established defendant paid excessive attention to Denzel, was well enmeshed in his life, and began to molest him during the summer of 2012. But the testimony does not establish that defendant touched Denzel before May 2012, or support an inference that he did so in April 2012. To the contrary, the court's careful questioning of Denzel elicited unequivocal testimony that the abuse did not last for more than one month. We therefore reverse the conviction for count 1.

14

### 1.2 There is sufficient evidence defendant touched Jeremy and Bradley (counts 15 and 24) with lewd intent.

A violation of section 288, subdivision (a) requires proof of the following elements:

1. The defendant willfully touched any part of a child's body, either on the bare skin or through the clothing;

2. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child; and

3. The child was younger than 14 years old at the time of the act.

(*People v. Martinez* (1995) 11 Cal.4th 434, 444 (*Martinez*).)

Section 288's defining characteristic is "the defendant's intent to sexually exploit a child, not the nature of the offending act." (*Martinez*, *supra*, 11 Cal.4th at p. 444.) Accordingly, "[a]ny touching of a child under the age of 14 violates [section 288, subdivision (a)], even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the intent to arouse or gratify the sexual desires of either the perpetrator or the victim." (*People v. Lopez* (1998) 19 Cal.4th 282, 289 (*Lopez*), citing *Martinez*, *supra*, at pp. 450–452, emphasis omitted.) Where, as in this case, the defendant's physical conduct might be consistent with a non-sexual purpose, the jury can look to surrounding circumstances and rely on them to draw inferences about his intent. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 440 ["Because intent for purposes of Penal Code section 288 can seldom be proven by direct evidence, it may be inferred from the circumstances."]; cf. *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1365 [jury could reasonably infer from the circumstances that defendants kidnapped the victims for the dual purposes of taking them and their car].) In determining whether defendant acted with lewd intent, the jury was entitled to consider the other charged counts and his pattern of conduct. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1381.)

It is undisputed that defendant kissed and hugged both Jeremy and Bradley. The prosecution also presented ample evidence that defendant's conduct with Jeremy and

15

Bradley—and his unusual attachment to both boys—mirrored the courtship phase of his relationships with Garrett, Justin, Cory, Ammon, Thomas, and Denzel. Upon consideration of the whole record, and based on defendant's extraordinary focus on these boys and strikingly similar methods of operation, the jury had sufficient evidence from which it could conclude defendant touched Jeremy and Bradley with the required intent. We affirm the convictions for counts 15 and 24.

### 2. Annoying or Molesting a Child (Counts 5 through 10)

Defendant was convicted of annoying or molesting six children, in violation of section 647.6, subdivision (a)(1)—Ricardo (count 5), Larry (count 6), Hunter (count 7), Wyatt (count 8), Richard (count 9), and David (count 10). A violation of section 647.6 requires proof of the following elements:

1. The defendant engaged in conduct directed at a child;

2. A normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct;

3. The defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child or in children generally; and

4. The child was under age 18 at the time of the conduct.

(*People v. Phillips* (2010) 188 Cal.App.4th 1383, 1396.)

As to each count, defendant contends the evidence was insufficient to prove the second element—objective irritation or offense, and in any event, the court prejudicially erred by instructing the jury that the People did not have to prove the third element--sexual motive. Alternatively, defendant contends motive is *not* an element of section 647.6, subdivision (a)(1); that CALCRIM No. 1122 misstates the law; and that the misstatement "altered the jury's focus and analysis of the evidence with an element that was not part of the charged offense," thereby prejudicing defendant.

The People, in turn, contend there was sufficient evidence of objectively irritating behavior. Rather than explaining how the defendant's behavior was objectively disturbing, however, the People point us to evidence of defendant's mental state, which we may not consider for this purpose, and the children's subjective

16

discomfort, which is irrelevant. (*Lopez*, *supra*, 19 Cal.4th at pp. 290-291.) The People also insist we should not consider the facts of other published cases on this topic because doing so would amount to "this Court . . . substitut[ing] its own judgment (or, rather appellant's judgment) for that of the jury[.]" Finally, as to each claim of instructional error, the People contend defendant forfeited the issue, the court did not err, and any error was harmless.

We conclude the convictions for counts 5 and 10 are not supported by substantial evidence of objectively irritating behavior. We conclude substantial evidence supports the convictions for counts 6 through 9, but the conflicting jury instructions on sexual motive violated defendant's right to due process of law. Because we reverse on that basis, we do not address defendant's novel assertion that CALCRIM No. 1122 misstates the law.

**2.1    Sufficiency of the Evidence of Objectively Irritating or Offensive Conduct**

Unlike section 288 (lewd act on a child), section 647.6, subdivision (a)(1) does not require a touching (*Lopez*, *supra*, 19 Cal.4th at p. 289), but does require conduct that would unhesitatingly disturb or irritate a normal person (*People v. Carskaddon* (1957) 49 Cal.2d 423, 426 (*Carskaddon*)). "[T]o determine whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, we employ an *objective* test[.]" (*Lopez*, *supra*, at p. 290.) The defendant's observable conduct, **on its own**, must unhesitatingly irritate or disturb a reasonable person; in evaluating it, we may not consider either the defendant's intent or the child's subjective discomfort. (*Id.* at p. 291.)

**a.    Ricardo (count 5) and David (count 10)**

For several years, Ricardo, David, and their older brothers, Eduardo and Enrique, slept over at defendant's house nearly every weekend. During these years, defendant hugged David three times and once kissed Ricardo on the top of the head. Defendant contends this behavior is not objectively disturbing. We agree.

17

As our colleagues in Division Seven have explored in detail, not all kisses are sexual. (*In re R.C.* (2011) 196 Cal.App.4th 741, 750–751.) A kiss's meaning changes with the era, culture, and even the family in which it occurs. (*Ibid.*) Because kisses possess such variety and meaning, *In re R.C.* hinged on whether the defendant kissed the child with an open or closed mouth. "Unlike kissing without the use of tongues, which is an important means of demonstrating parental love and affection for a child, there can be no innocent or lovingly affectionate tongue kissing of a child by an adult." (*Ibid.*) Though the People ask us to hold that kissing a child on the top of the head is always objectively disturbing, we agree with our colleagues in Division Seven that without more, a closed-mouth kiss is not necessarily a sexual act.

Here, defendant hugged David and gave Ricardo a brief goodnight kiss on the top of the head. There is no evidence suggesting the kiss or the hug were of any significant duration, that defendant tried to touch either boy—or himself—in any way, or that he became aroused then or later. Put simply, there is no evidence defendant's actions consisted of anything more than the briefest peck or embrace, such as might be exchanged by friends or family members as an expression of nonsexual affection. While Ricardo and David may have been uncomfortable, in light of defendant's lengthy, close relationship with their family, defendant's actions were not objectively disturbing. Because there is insufficient evidence to support the convictions involving Ricardo and David, we reverse counts 5 and 10.

b.    **Richard, Wyatt, Hunter, and Larry (counts 6 through 9)**

While defendant's interactions with Ricardo and David were reasonable in light of his close relationship with their family, the attention he paid to Rachel's sons--Richard, Wyatt, Hunter, and Larry—was alarming. Defendant kissed and hugged the boys on their second meeting. He tried to see them every day. Defendant appeared at Rachel's house uninvited—or invented a pretext to come over despite her objections. He called the house to wish the boys goodnight, and asked Rachel to tell them that he missed them, and that he loved them. When defendant took the boys to the desert to shoot Airsoft pistols, defendant put each of them in his lap and let them steer the car.

18

Indeed, the jury could have reasonably inferred defendant took Rachel's sons on this trip without Rachel's knowledge; while all four boys testified to the outing, neither Rachel nor her mother mentioned it. Rachel testified that defendant acted "like a teenage girl [who] had a crush on a boy[.] . . . [He called] to see my children, four, five, six times a day, after I would say no, we're busy, now isn't a good time, we're preparing for school. My kids are going to bed early. He wouldn't take no for an answer, he still would call to see what we were doing and what was going on, if he could come over." Defendant's behavior was "totally inappropriate" and felt "like stalking". He knew the family for no longer than five weeks. We therefore conclude substantial evidence supports the convictions for counts 6, 7, 8, and 9.

### 2.2 The court erred by instructing the jury that the People did not have to prove motive, because motive was an element of the charged offenses.

Defendant contends conflicting motive instructions allowed the prosecution to convict him of annoying or molesting a child without proving every element of the offense beyond a reasonable doubt. The People contend defendant forfeited the issue, the court did not err, and any error was harmless. We find no forfeiture and conclude the instructions violated defendant's 14th Amendment right to due process of law. Because the People have not proven beyond a reasonable doubt that the error was harmless, we reverse the convictions for counts 6 through 9.

As a preliminary matter, we address the People's argument that defendant forfeited his claim of instructional error because he did not object to the instructions, or seek their revision, at trial. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570.) Certainly, a criminal defendant has a right to accurate instructions on the elements of a charged crime. (*People v. Mil* (2012) 53 Cal.4th 400, 409 (*Mil*).) And it is settled that a defendant need not object to preserve a challenge to an instruction that affects his substantial rights. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 106; see § 1259 [we "may also review any instruction given, refused or modified, even though no objection was made thereto in the trial court if the substantial rights of the defendant were affected

19

thereby."], § 1469 [same].) Because defendant contends CALCRIM No. 370 removed an element of the offense from the jury's consideration, the instructional error affected his substantial rights. We therefore review the issue de novo despite his failure to object below.[7]

### a. The court erred by instructing the jury with an unmodified version of CALCRIM No. 370.

The Due Process Clause "[protects] the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068]; U.S. Const., 14th Amend.) Because due process principles require the prosecution to prove every element of the crime beyond a reasonable doubt, jury "instructions *completely removing* the issue of intent from the jury's consideration may constitute a denial of federal due process[.]" (*People v. Lee* (1987) 43 Cal.3d 666, 673.) Conflicting intent instructions—where one instruction requires the prosecution to prove intent while another instruction eliminates that requirement—can operate the same way. (*Id.* at pp. 673–674.) Accordingly, "[i]f conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process[.]" (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126–1128 (*Maurer*).) This is so even where the court's instructions on the offense itself correctly explain the required intent, because we have "no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." (*Francis v. Franklin* (1985) 471 U.S. 307, 322 [105 S.Ct. 1965]; *People v. Gay* (2008) 42 Cal.4th 1195, 1225–1226.) CALCRIM No. 1122 and CALCRIM No. 370 are one such pair of conflicting instructions.

Motive is not generally an element of a criminal offense. But when it *is* an element, the trial court errs by giving an unmodified version of CALCRIM No. 370, an

---

[7]    Because we conclude defendant did not forfeit this issue, we do not address his additional contention that defense counsel was ineffective for failing to object.

optional instruction that tells the jury the prosecutor need not prove the defendant's motive to commit the charged crimes. (*Maurer*, *supra*, 32 Cal.App.4th at p. 1128; see *People v. Romo* (1975) 14 Cal.3d 189, 196 [not error to refuse instruction on motive].) To convict a defendant of violating section 647.6, the prosecution must prove the defendant was motivated by an unnatural sexual interest in a particular child or in children generally. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504.) Here, the court instructed the jury with *both* CALCRIM No. 1122, which correctly instructs that the prosecution must prove the defendant acted with sexual motive, *and* CALCRIM No. 370, which incorrectly instructs that the prosecution does *not* have to prove motive. (Compare CALCRIM No. 1122 ["People must prove that . . . [t]he defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child"] with CALCRIM No. 370 ["The People are not required to prove that the defendant had a motive to commit any of the crimes charged."].) When given together, the instructions effectively "removed the mental state element" from the jury's consideration. (*Maurer*, *supra*, at pp. 1128–1129.) This was error, which we treat as a failure to instruct on an element of the offense. (*Ibid.*)

> **b.** **The People have not proven the instructional error was harmless beyond a reasonable doubt.**

We assess federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] (*Chapman*). Under *Chapman*, we must reverse unless the People "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.*) Where the trial court fails to instruct on an element of the charged offense, however, the People must make a more substantial showing. That showing is governed by *Neder v. United States* (1999) 527 U.S. 1, 17–19 [119 S.Ct. 1827] (*Neder*), and by the California Supreme Court's decision interpreting *Neder*, *People v. Mil, supra,* 53 Cal.4th 400—authority both parties fail to discuss.

"*Neder* instructs us to 'conduct a thorough examination of the record. If, at the end of that examination [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant

21

contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless.' " (*Mil*, *supra*, 53 Cal.4th at p. 417, quoting *Neder*, *supra*, 527 U.S. at p. 19.) On the other hand, the error is harmless if the People can prove beyond a reasonable doubt that the omitted element was uncontested and supported by such overwhelming evidence that no rational juror could come to a different conclusion. (*Mil*, *supra*, at pp. 417–419; accord, *People v. French* (2008) 43 Cal.4th 36, 53.)

Here, the People's "analysis of the prejudicial effect of the instructional error suggests" not only that they failed to apply *Neder*, but also that they "may have relied instead on the less demanding standard of whether [the motive] finding was supported by substantial evidence." (*Mil*, *supra*, 53 Cal.4th at p. 417.) The People have not addressed the evidence supporting the defense on the omitted element. Instead, as in *Mil*, the People's argument "focused exclusively on evidence that was favorable to the verdict" and presented "the evidence in the light most favorable to the prosecution[.]" (*Id.* at pp. 417–418.) In assessing prejudice, we must "determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' " (*Id.* at p. 417, quoting *Neder*, *supra*, 527 U.S. at p. 19.) Therefore, our "task in analyzing the prejudice from the instructional error is" not to determine whether a reasonable jury could have believed defendant acted with sexual motive, but rather, "whether any rational fact finder could have come to the *opposite* conclusion." (*Mil*, at p. 418.) This is the converse of the substantial evidence test. If the record shows some evidentiary basis for a finding in the defendant's favor on the omitted element, the People have not met their burden and we must reverse. (*Id.* at pp. 417-419.)

Certainly, there was ample evidence defendant's disturbing conduct in this case was motivated by an unnatural sexual interest in children. However, under *Mil*, we must determine whether there is substantial evidence supporting a *contrary* finding on the omitted element. (*Mil*, *supra*, at pp. 417–419.) We therefore review the evidence in the light most favorable to defendant; we may not reweigh the evidence or resolve

22

evidentiary conflicts. (Cf. *People v. Young*, *supra*, 34 Cal.4th at p. 1181 [substantial evidence review].) The testimony of a single witness may be sufficient—even if there is significant countervailing evidence, and the testimony is subject to justifiable suspicion. (See *People v. Barnwell*, *supra*, 41 Cal.4th at p. 1052.) We conclude defendant's testimony was sufficient to support an alternative conclusion on the omitted element. Defendant described hugging Hunter, Wyatt, Richard, and Larry in a nonsexual, innocent way—"a simple expressing your feeling to a fellow human being" who had not yet learned to fear feelings. If one of the boys scored a goal, defendant gave him a celebratory hug. If one of them got in a fight, or got hurt, or cried, defendant gave him a comforting hug. Defendant testified that his interactions with the brothers showed a family friend's "innocuous" affection for "good little kids." He testified his behavior was not motivated by anything "nefarious or sinister" and there were no "sexual connotations attached to it." This testimony, if believed, would have supported a contrary finding on the omitted element. Because the People have not proven the error was harmless beyond a reasonable doubt, we reverse the convictions for counts 6 through 9 and remand for retrial.

### 3. Failure to Admonish the Victim Support Person

At trial, Denzel (count 1), Ricardo (count 5), Larry (count 6), Hunter (count 7), Wyatt (count 8), Richard (count 9), Jeremy (count 15), Bradley (count 24), and Jeremy's brother, Ryan, testified with the support of a victim advocate employed by the District Attorney's office, as permitted by section 868.5, subdivision (a). Defendant contends the court erred "by failing to admonish the witness advocate to not prompt, sway, or influence any of the testifying witnesses in any way." Though he acknowledges the record contains no evidence the victim advocate behaved improperly, he contends the omission "allowed for a distorted presentation of evidence as to the disputed crimes, . . . and deprived appellant of the constitutional due process and fair trial rights to which he was entitled." We conclude defendant has forfeited this issue by failing to object below. In any event, we conclude the trial court was not required to admonish the victim advocate, and no discernible prejudice arose from the support system used

23

here.  Accordingly, we also reject defendant's claim that the failure to object amounted to ineffective assistance of counsel.

### 3.1    Forfeiture and Ineffective Assistance of Counsel

Though nine witnesses testified with the support of a victim advocate, defendant did not object below that the court failed to admonish them.  Nor did defendant object to any other aspect of the victim-support procedure used at trial.  As such, defendant forfeited this claim by failing to present it at trial.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1214 (*Myles*).)  However, defendant also argues, "[i]f this court concludes the argument is forfeited because of no objection, then a finding of ineffective assistance of counsel must follow."  We disagree.

Under either the federal or state constitution, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052] (*Strickland*).)  To establish ineffective assistance, defendant must satisfy two requirements.  (*Id.* at pp. 690–692.)  First, he must show his attorney's conduct was "outside the wide range of professionally competent assistance."  (*Id.* at p. 690.)  Then, he must demonstrate the deficient performance was prejudicial—i.e., there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been different.  (*Id.* at p. 694.)  "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors, the result would have been different."  (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)  We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Strickland*, *supra*, at p. 697.)  We therefore turn first to the merits of defendant's argument.

### 3.2    The Support

Before trial, the prosecutor moved in limine to allow a professional victim advocate employed by the District Attorney's office to sit with the minor witnesses

while they testified. At the Evidence Code section 402 hearing that followed, the court explained the procedure it would use: "That's fine. [The witnesses will] be advised ahead of time they can't talk with [the victim advocate], just the comfort of having her be there should be good. With the minors, she [will] sit right behind them. The deputy will help us if you just let us know on that day what we need to do. The deputy will help us, get that set up." The court then asked if defense counsel had any objections. Counsel replied, "That's fine." On the record before us, it appears the court did not advise the advocate of her role, function, duty, or behavior.

At trial, as the witnesses testified, the prosecutor alerted the court when a witness would be testifying with the support of a victim advocate. Ultimately, Denzel, Ricardo, Larry, Hunter, Wyatt, Richard, Bradley, Jeremy, and Jeremy's brother, Ryan, used their services. Neither party asked the court to explain the presence of the victim advocate or her role to the jury.

### 3.3     No admonition was required under the statute.

In prosecutions for certain violent crimes and sex offenses, including violations of sections 288, 288.5, and 647.6, every prosecuting witness[8] "shall be entitled, for support, to the attendance of up to two persons" while he testifies. (§ 868.5, subd. (a).) Only one support person may accompany the witness to the stand. (*Ibid.*)

A witness is entitled to choose his own support person, and sometimes picks another prosecuting witness. Although this procedure could cause logistical and legal problems, subdivisions (b) and (c) impose additional requirements where a support person is also a witness. (§ 868.5, subds. (b), (c).) In those cases, the court must determine whether the support person's attendance is necessary; in juvenile cases, the

---

[8]     Section 868.5 uses the term "prosecuting witness" to refer to a witness entitled to an emotional-support person when testifying at a trial for a specified violent crime or sex offense. Ryan, who testified about defendant's interactions with his brother Jeremy, was not an alleged victim in this case. But because the term "prosecuting witness" encompasses non-victim minor witnesses, Ryan was properly provided with a victim advocate during his testimony. (*People v. Adams* (1993) 19 Cal.App.4th 412, 433–434 & fn. 7.)

25

court must inform her that the proceedings are confidential; and "[i]n all cases," the judge must admonish her not to "prompt, sway, or influence the [supported] witness in any way." (§ 868.5, subd. (b).) Defendant contends the admonition not to "prompt, sway, or influence" must be given to all support people—not just witnesses—and should have been given here. As a matter of first impression, we conclude the admonition applies only to support people who are also witnesses.[9]

The meaning of *in all cases* in subdivision (b) is a "question[] of statutory interpretation that we must consider de novo." (*People v. Prunty* (2015) 62 Cal.4th 59, 71.) In construing the statute, our fundamental task is "to ascertain and effectuate the intended legislative purpose. [Citation.] The text of the statute is our starting point, and 'generally provide[s] the most reliable indicator' of the Legislature's intended purpose." (*Id.* at p. 72.) " 'We give the language its usual and ordinary meaning, and "[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs." [Citation.] If, however, the statutory language is ambiguous, "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." [Citation.] Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.]' " (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)

As discussed, section 868.5, subdivision (a) sets out the general rule that in sex-crime cases, prosecuting witnesses are entitled to the support of two people—one of whom may accompany the witness to the stand. Subdivision (b) adds additional requirements: "*If the person or persons so chosen are also witnesses*, the prosecution

---

[9]     *People v. Spence,* which concerned whether a therapy dog is a "person" under section 868.5, assumed—but did not hold—that the court must admonish the support person regardless of whether she is also a prosecuting witness. (*People v. Spence* (2012) 212 Cal.App.4th 478, 514 (*Spence*).) However, *Spence* does not explain this view, and in any event, " 'an opinion is not authority for a proposition not therein considered.' " (*People v. Williams* (2005) 35 Cal.4th 817, 827.)

26

shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness. Upon that showing, the court shall grant the request unless [it would prejudice the defendant]. *In the case of a juvenile court proceeding*, the judge shall inform the support person or persons that juvenile court proceedings are confidential and may not be discussed with anyone not in attendance at the proceedings. *In all cases*, the judge shall admonish the support person or persons to not prompt, sway, or influence the witness in any way." (§ 868.5, subd. (b), emphasis added.)

"Words and phrases in a statute are construed according to the rules of grammar and common usage." (3 Sutherland Statutory Construction (7th ed., rev. Apr. 2014) § 59.8.) The requirements that the court admonish the support person *in juvenile cases* and that it do so *in all cases* were added to the statute together when the Legislature amended it in 1987, and are grammatically linked. (Stats.1987, ch. 704 (A.B. 1068), § 1.) Together, the sentences require the court: (1) in juvenile cases, to inform the support person that the proceedings are confidential, and (2) in both juvenile cases *and* non-juvenile cases, to admonish the support person not to influence the witness. (Cf. *Gutierrez v. Ada* (2000) 528 U.S. 250, 254–255 [interpreting phrase "any election" to mean any gubernatorial election, based on surrounding sentences].) In context, *in all cases* distinguishes not the beginning of the paragraph ("If the [support] person . . . [is] also a witness . . . "), but the previous sentence. That is, the language differentiates not the type of support person, but the type of case.

The statute's structure supports this construction. Although we look first at the words of a statute, we do not consider the statutory language in isolation; rather, we read the statute "as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.) We construe all parts of a statute together, without according undue importance to a single or isolated portion. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228 (*Cooley*).) Subdivision (a) explains which witnesses are entitled to support, who the support person may be, and how she may behave. For example,

27

a member of the press may not act as a support person unless she is closely related to the witness, in which case the reporter may act as a support person but may not take notes. (§ 868.5, subd. (a).) Subdivision (b) establishes additional pretrial procedures where the support person is also a witness. Then, subdivision (c) creates trial procedures for the testimony of the supported witness and supporting witness. Had the Legislature wanted the court to admonish *all* support people, witness and non-witness alike, it would have made little sense, logically or grammatically, to include that requirement amidst the witness-specific provisions in subdivisions (b) and (c), rather than with the general requirements in subdivision (a). (See *People v. Johns* (1997) 56 Cal.App.4th 550, 554–555 (*Johns*) [no showing of helpfulness required under subd. (b) because victim advocate was not a witness].) Since the support people in this case did not testify, the court did not err by failing to admonish them.

### 3.4. Defendant's constitutional rights were not violated.

Notwithstanding the statutory language limiting the admonitions to support persons who are also witnesses, the warnings may be more broadly required if they are necessary to protect the constitutional rights of the accused. (*People v. Patten* (1992) 9 Cal.App.4th 1718, 1725–1727 (*Patten*).) However, we find the use of the victim advocate in this case did not violate defendant's constitutional rights. A support person's mere presence with a testifying witness does not violate the defendant's due process or Confrontation Clause rights. (*Spence*, *supra*, 212 Cal.App.4th at p. 514, citing *Myles*, *supra*, 53 Cal.4th at pp. 1214-1215.) Certainly, we acknowledge there may be a constitutional violation where the support person interferes with the witness's testimony in a way that adversely affects the jury's ability to assess that testimony. (*Spence*, *supra*, at p. 514.) For example, emotional displays or physical contact with the witness may signal to the jury that the support person believes or endorses the witness's testimony. (*Myles*, *supra*, at pp. 1214–1215.) And though there is a split of authority on the issue, at least one court has held the Confrontation Clause requires a case-specific finding of need in *every* case. (Compare *People v. Adams, supra,* 19 Cal.App.4th at pp. 437–444 [case-specific finding required in all cases] with *Patten*, *supra*,

9 Cal.App.4th at pp. 1725–1727 [finding not required in every case] and *Johns*, *supra*, 56 Cal.App.4th at pp. 554–555 [no showing of helpfulness required to justify presence of non-witness support person].)

To the extent admonishing a support person not to "prompt, sway, or influence the witness in any way" helps the court avoid potential constitutional pitfalls, admonitions would have been appropriate in this case. However, as *Spence* observed, "[a]lthough it would have been the better practice for the trial court to expressly make standard admonitions under section 868.5 that this support person should not do anything to sway or influence the witness, the court could logically have assumed that it was not necessary to do so, because the non[-]witness victim advocate from the District Attorney's office was presumably familiar with courtroom decorum rules." (*Spence*, *supra*, 212 Cal.App.4th at pp. 517–518.) Here, it was understandable that the court focused on instructing the children, who presumably had much less experience with court procedures than the professional victim advocate employed by the District Attorney's office. We find no constitutional violation.

### 3.5 Any error was harmless.

Even assuming the failure to explain courtroom decorum to a professional victim advocate could "deprive[] appellant of the constitutional due process and fair trial rights to which he was entitled," defendant has failed to show error in this case. To establish a due process violation, the record must clearly identify the support person, where she sat, and how she behaved during the witness's testimony. (*Myles*, *supra*, 53 Cal.4th at pp. 1214–1215.) Defendant acknowledges the record in this case does not contain the required information, but makes no effort to explain how the omission harmed him. Instead, defendant launches into a lengthy non sequitur that juxtaposing the terms "People" and "defendant" prejudicially implies the accused is non-human. We note that any objections to the nomenclature used at trial should have been raised below. If defendant wished to be called by some other term, the proper procedure was to bring a motion in limine. (See, e.g., Giarrusso, The General and Captain Justice (2014) 61 La. B.J. 392 [suggesting "Citizen Accused" and "that innocent man" as alternatives

to "defendant"].)  In any event, we conclude there is no reasonable probability the result in this case would have been different if the court had admonished the support person.  (See *Strickland*, *supra*, 466 U.S. at pp. 694, 697.)  Accordingly, counsel was not ineffective for failing to object.  (*Id.* at pp. 690–694.)

### 4.      Defendant's conviction for count 14, and sentences for counts 2 and 12 violate the Ex Post Facto Clause.

The parties agree that defendant's count 14 conviction for committing a lewd act on a child (§ 288, subd. (c)(1); Alexis), and the one-strike sentences imposed for continuous sexual abuse as charged in counts 2 and 12 (§ 288.5; Garrett and Cory) violate the ex post facto clauses of the United States and California constitutions.  Defendant also contends the one-strike sentences imposed for continuous sexual abuse as charged in counts 13 and 20 (§ 288.5; Ammon and Thomas) are unauthorized.  The People argue that because counts 13 and 20 concern conduct that continued after the One Strike Law was amended in 2006 to include violations of section 288.5, they fall within the straddle-offense exception to the Ex Post Facto Clause.  Neither party notes that the failure to submit the question to the jury violated defendant's Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* and its progeny.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [120 S.Ct. 2348] (*Apprendi*).)  We nevertheless conclude the People have proven the error was harmless beyond a reasonable doubt.

Accordingly, as we explain below, we reverse defendant's conviction for count 14, affirm the sentences for counts 13 and 20, vacate the indeterminate sentences imposed for counts 2 and 12, and remand with directions to sentence defendant to authorized determinate terms for counts 2 and 12.

### 4.1      The Ex Post Facto Clause

The United States Constitution and the California Constitution proscribe ex post facto laws.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)  Under both constitutions, "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."  (*Collins v. Youngblood* (1990) 497 U.S. 37, 42–43 [110 S.Ct. 2715]; *People v. Grant* (1999) 20 Cal.4th 150, 158 (*Grant*).)  We interpret the

California Constitution's Ex Post Facto Clause coextensively with its federal counterpart. (*People v. Snook* (1997) 16 Cal.4th 1210, 1220.)

We may correct an unauthorized sentence on appeal despite failure to object below. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) A sentence is unauthorized if "it could not lawfully be imposed under any circumstance in the particular case." (*Ibid*.)

### 4.2 Section 288, subdivision (c) did not exist on June 8, 1988, the last day on which defendant could have committed the crime.

Defendant was charged in count 14 with committing a lewd act on Alexis when she was 14 or 15 years old and he was more than 10 years older than she (§ 288, subd. (c)(1)). The prosecution alleged the lewd act occurred on or between June 9, 1983 and June 8, 1988. Defendant contends his conviction for count 14 was barred by the statute of limitations, supported by insufficient evidence, based on conduct that did not violate the statute, and based on sexual intercourse with his lawful wife. In response, the People concede the count 14 conviction should be reversed, but only because the charged crime did not exist on June 8, 1988, and the conviction therefore violates the Ex Post Facto Clause.[10]

Before September 27, 1988, section 288 comprised two distinct crimes— subsections (a) and (b), both of which prohibited lewd acts on children younger than 14. (§ 288 (West 1988).) Subdivision (c) was added to punish lewd acts on 14- or 15-year-old children; it was approved on September 26, 1988, and filed the next day. (Stats.1988, ch. 1398 (A.B. 3835), § 1.) Therefore, on June 8, 1988—the day before Alexis's 16th birthday, and the last day on which defendant could have violated

---

[10] Because we agree with the People on this point, we do not address defendant's additional challenges to his count 14 conviction, including his allegations that the prosecutor abused the charging function and misstated the law during argument, and that defense counsel was ineffective for failing to object. In not addressing these additional challenges, we do not condone what happened here. We are always troubled when a criminal defendant is charged with and convicted of a crime that did not exist when it was allegedly committed. A statute's effective date is not a mere technicality; it is fundamental to due process.

subdivision (c)—subdivision (c) did not yet exist.  Because section 288 did not prohibit defendant's conduct until after Alexis's 16th birthday, we conclude defendant's count 14 conviction violates the Ex Post Facto Clause.  We therefore reverse the conviction for count 14.  It may not be retried.

### 4.3     Section 288.5 did not become a one-strike offense until 2006.[11]

Enacted in 1994, California's One Strike Law, section 667.61, requires indeterminate life sentences for enumerated sex offenses committed under certain aggravating circumstances.  (§ 667.61, subd. (b).)  Effective September 20, 2006, the One Strike Law was amended to apply to defendants convicted of continuous sexual abuse of a child (§ 288.5).  (Stats.2006, ch. 337 (S.B.1128), § 33.)  However, before 2006, section 288.5 was not a one-strike offense.  (See Stats.1993–94, 1st Ex.Sess., ch. 14 (S.B.26), § 1 [1994 version]; Stats.1997, ch. 817 (A.B.59), § 6 [1997 version]; Stats.1998, ch. 936 (A.B.105), § 9 [1998 version].)  The indeterminate life sentences now prescribed by section 667.61 greatly exceed the determinate sentences of 6, 12, or 16 years previously available for violations of section 288.5.[12]  Thus, the Ex Post Facto Clause prohibits sentencing defendants under the One Strike Law for section 288.5 violations committed before September 20, 2006.  (See *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257–262 [applying Ex Post Facto Clause to § 288 violations].)

Here, the jury convicted defendant of five counts of continuous sexual abuse of a child (§ 288.5), and found multiple-victim allegations true for each count.  The prosecutor requested, and the court imposed, five consecutive terms of 15 years to life under the One Strike Law.  However, four of the five counts concerned conduct that

---

[11]     At our request, the parties submitted letter briefs discussing this issue after the normal briefing period had expired.

[12]     Section 288.5 was adopted in 1989 with a sentencing triad of 6, 12, or 16 years.  (Stats.1989, ch. 1402, § 4.)  Though it has been amended since then, the determinate sentencing triad has not changed.  (See *People v. Riskin* (2006) 143 Cal.App.4th 234, 246.)

entirely (counts 2 and 12) or partially (counts 13 and 20) occurred before the 2006 amendment.

### a. Offenses Committed Before 2006

In count 2, defendant was convicted of continuous sexual abuse of Garrett "[o]n or between January 1, 1994 and December 31, 2004." In count 12, defendant was convicted of continuous sexual abuse of Cory "[o]n or between January 1, 1997 and December 1, 2004." Defendant argues, and the People concede, that because these crimes could not have occurred after the 2006 amendment to section 667.61, the one-strike sentences imposed for those counts are unauthorized. (See *People v. Palmer* (2001) 86 Cal.App.4th 440, 443 [noting § 288.5 was not a qualifying offense in 2001].) We therefore vacate the indeterminate sentences imposed for counts 2 and 12, and remand for imposition of authorized determinate terms.

### b. Offenses Committed Before *and* After 2006

Count 13 charged defendant with continuous sexual abuse of Ammon "[o]n or between November 7, 2001 and November 6, 2010." Count 20 charged defendant with continuous sexual abuse of Thomas "[o]n or between September 27, 2005 and September 26, 2007." Because he could have completed these acts before the 2006 amendment to the One Strike Law, defendant contends his indeterminate sentences for those counts violate the Ex Post Facto Clause. The People argue that because section 288.5 prohibits a continuous course of conduct rather than a series of individual acts, the crimes were incomplete until the abuse ended; because the sexual abuse of Ammon and Thomas continued after the One Strike Law was amended in 2006, counts 13 and 20 fall under the straddle-offense exception to the Ex Post Facto Clause.

In general, "a law is retroactive only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was *completed* before the law's effective date. [Citations.] Thus, the critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date." (*People v. Grant, supra,* 20 Cal.4th at p. 157.) " 'A continuous course of conduct offense cannot logically be

33

"completed" until the last requisite act is performed.  Where an offense is of a continuing nature, and the conduct continues after the enactment of a statute, that statute may be applied without violating the ex post facto prohibition.' " (*Id*. at p. 159) Section 288.5 punishes a continuous course of conduct, not three or more constituent acts.  (*Id.* at p. 159.)  Therefore, in *Grant*, the court found no ex post facto violation where the continuous sexual abuse began before, and continued after, the effective date of section 288.5.  (*Id.* at pp. 157–159.)  The *Grant* court was able to make that determination because the trial court instructed the jury that it could not convict unless at least one act of abuse occurred after the statute's effective date.  (*Id.* at pp. 157–158.) Unlike the jury in *Grant*, however, the jury in this case was not instructed that at least one act of abuse must have occurred after the 2006 amendment to the One Strike Law. This was error.

In *Apprendi*, the United States Supreme Court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.)  In *Blakely v. Washington*, the Court explained that the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (*Blakely v. Washington* (2004) 542 U.S. 296, 303 [124 S.Ct. 2531] (*Blakely*).)  And, in *Alleyne v. United States*, the Court extended that reasoning to mandatory minimum sentences like those required under the One Strike Law, holding, "[a]ny fact that increases the mandatory minimum is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." (*Alleyne v. United States* (June 17, 2013) __ U.S. __ [133 S.Ct. 2151, 2155] (*Alleyne*).)

Under *Apprendi*, *Blakely*, and *Alleyne*, any fact that increases a defendant's minimum or maximum sentence is an element of the offense that must be submitted to the jury.  (See *Alleyne*, *supra*, 133 S.Ct. at pp. 2155, 2157–2158.)  Under *Grant*, defendant is eligible for one-strike sentencing only if the continuous sexual abuse of Ammon and Thomas continued beyond September 20, 2006 the effective date of the

34

2006 amendment; if the abuse ended before that date, defendant's indeterminate sentence violates the Ex Post Facto Clause. Because the date of the last act of sexual abuse increased defendant's mandatory minimum and maximum sentences, the date was an element of each charged crime. The court's failure to instruct that at least one instance of sexual abuse had to occur on or after September 20, 2006, therefore, is federal constitutional error comparable to the omission of an element, and is subject to *Chapman-Neder* harmless error review. (*Washington v. Recuenco* (2006) 548 U.S. 212, 222 [126 S.Ct. 2546].)

As discussed, under *Mil* and *Neder*, the failure to instruct on an element of the offense is harmless if the People prove beyond a reasonable doubt that no substantial evidence supports a contrary finding on the omitted element. (*Mil*, *supra*, 53 Cal.4th pp. 417–419; *Neder*, *supra*, 527 U.S. at pp. 17–19.) We conclude the People have carried their burden. There is overwhelming evidence the abuse of both boys continued well after the 2006 amendment to the One Strike Law—and though defendant denied molesting Thomas and Ammon, he did not contest the dates of abuse. Therefore, he did not contest the omitted element of the crimes charged in counts 13 and 20.

In count 13, the information charged defendant with continuous sexual abuse of Ammon "[o]n or between November 7, 2001 and November 6, 2010." In 2004, Ammon was sleeping over at defendant's house nearly every weekend—and defendant molested him on nearly every visit. During those visits, defendant touched Ammon's penis, put his mouth on Ammon's penis, and masturbated Ammon and himself. Ammon testified that the abuse continued after defendant moved to Quartz Hills in early 2006, and lasted until at least 2010, when defendant began coaching the Red Devils.

Defendant's testimony is consistent with Ammon's account. Defendant testified that he sent Ammon a letter sometime before Ammon moved to Las Vegas. In the letter, defendant wrote that he would always love Ammon "all the numbers," an expression defendant says he invented with Jeremy. Thus, under defendant's version of events, the letter must have postdated defendant's summer 2010 acquaintance with Jeremy. Defendant also testified that he wrote the letter because he hurt Ammon's feelings by

35

spending more time with Enrique, Eduardo, and their brothers, and less time with Ammon: "Shortly after this period [when defendant rejected him], [Ammon] had to move away and I didn't want him to move away having this ill feeling towards me." In sum, because defendant's testimony establishes the letter was written "shortly after" he rejected Ammon, and could not have been written before summer 2010, when he met Jeremy, defendant could not have rejected Ammon before September 20, 2006. Therefore, defendant did not present substantial evidence to support a contrary finding on the omitted element—i.e., that the abuse ended before the 2006 amendment to the One Strike Law. Because the People have "prove[n] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman*, *supra*, 386 U.S. at p. 24), we affirm the one-strike sentence for count 13.

Count 20 of the information charged defendant with continuous sexual abuse of Thomas "[o]n or between September 27, 2005 and September 26, 2007." Thomas met defendant when he was nine years old, and in Ammon's fourth grade class—sometime between October 2005 and June 2006. He went to defendant's house two or three times each week until sixth grade, which he was scheduled to begin in 2007. Every time Thomas visited defendant, defendant sat Thomas on his lap, reached his hand into Thomas's pants, and stroked his penis and buttocks. Defendant put his fingers around Thomas's anus and kissed his neck. The abuse continued as long as Thomas spent time at defendant's house; when Thomas stopped going to see defendant, the abuse stopped. In 2007, Thomas failed fifth grade, and Ammon moved away. Thomas did not visit defendant without Ammon.

Defendant testified Thomas visited his house only once, and defendant never touched him inappropriately. However, the jury could not have convicted defendant of continuous sexual abuse of Thomas without finding at least three sexual acts—and there was no basis for the jury to find three acts without also determining defendant molested Thomas until he lost touch with Ammon in 2007. Accordingly, we conclude defendant did not present sufficient evidence to support a finding that the abuse ended before the 2006 amendment to the One Strike Law, and the People have "prove[n] beyond

36

a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)

    5.      **The court properly imposed consecutive one-strike sentences.**

At sentencing, the court imposed consecutive terms of 15 years to life for defendant's convictions of continuous sexual abuse in counts 1, 2, 12, 13, and 20 (§ 288.5; Denzel, Garrett, Cory, Ammon, and Thomas) and lewd act on a child younger than 14 in counts 15, 23, and 24 (§ 288, subd. (a); Jeremy, Justin, and Bradley). Defendant contends, "[i]n imposing the consecutive sentences on these counts, there is nothing in the record from which it may be reasonably concluded . . . the trial court wasn't simply acquiescing to what it perceived as a mandatory sentence rather than exercising its discretion." Because we reverse count 1 for insufficient evidence and conclude the One Strike Law does not apply to counts 2 and 12, defendant's argument is moot as to those counts. As to counts 13, 15, 20, 23, and 24, we conclude defendant has forfeited this claim. (*Scott*, *supra*, 9 Cal.4th at p. 353 [forfeiture rule applied to claim the trial court failed "to properly make or articulate its discretionary sentencing choices"].) We also conclude the record contains abundant evidence that the court exercised its discretion to impose the maximum allowable sentence. Because it is not reasonably probable the result would have been different if counsel had objected, counsel was not ineffective for failing to do so. (*Strickland*, *supra*, 466 U.S. at pp. 694, 697.)

Defendant is correct that the court had discretion to impose concurrent, rather than consecutive, one-strike sentences in this case. (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.) However, defendant is mistaken that we must reverse because the record does not affirmatively show the court understood this discretion. "The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) This "presumption of regularity of judicial exercises of discretion appl[ies] to sentencing issues." (*Ibid.*) Indeed, in every case defendant cites, the record affirmatively demonstrated the trial court's misunderstanding of its discretionary sentencing options.

(See, e.g., *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1260–1261 [court expressed its belief that it lacked discretion to impose concurrent one-strike sentences].) Here, the record contains no indication the court believed it lacked discretion to impose concurrent sentences.

To the contrary, the sentencing transcript reveals the court's sentencing choices were guided by empathy for the victims and grounded in the court's view, "[b]ased on the defendant's actions supported by the jury's verdicts, defendant Renoir Valenti poses a serious threat to the safety of not only the Antelope Valley, but to all young people." The court's concern for the victims is reflected in the care it took to assure defendant would appear in court to hear the eight victim-impact statements presented at sentencing. The judge warned defendant in advance, "Every one [of] these people have an opportunity and have a right to make a victim impact statement, and I want you to be here so they can look at you and say what they have to say, if they choose to do so. . . . These people have been through a lot for many, many years, and they deserve to have you present for them to make their victim impact statements." The court also signed a conditional extraction order, which allowed the sheriff to bring defendant to court by force if he refused to come voluntarily.

After hearing the victims' statements and counsel's arguments, the court addressed defendant at length. The remarks expressed deep compassion for the victims, and concluded, "You, sir, I would hope for the rest of your days, learn how to try to understand how you could hurt so many and use the many years that you will find yourself in prison making something of yourself in a productive manner and hopefully never harm another person again. In this case you will have a lifetime in prison to figure that out."

On this record, there is no reasonable probability that the court would have imposed any sentence other than the maximum allowable term if counsel had objected. (*Strickland*, *supra*, 466 U.S. at p. 694.) We conclude counsel was not ineffective.

### 6. Noneconomic Restitution (§ 1202.4, subd. (f)(3)(F))

At sentencing, the court awarded noneconomic restitution to each victim of defendant's continuous sexual abuse (§ 288.5; counts 1–2, 12–13, 20) and lewd acts (§ 288, subd. (a); counts 15, 23, 24) under section 1202.4, subdivision (f)(3)(F). Defendant contends the restitution order is improper in five related ways—the statute deprives him of the right to a civil jury trial under the California Constitution; the statute deprives him of his Sixth Amendment right to a jury trial under *Apprendi*; the statute violates the Equal Protection Clause by irrationally distinguishing between child predators; the sums awarded are not sufficiently related to the victims' individual losses; and as to the section 288.5 counts, noneconomic restitution is not authorized by statute.

The People concede, and we agree, that section 1202.4, subdivision (f)(3)(F) does not authorize noneconomic damage awards to the section 288.5 victims (counts 1 [Denzel], 2 [Garrett], 12 [Cory], 13 [Ammon], and 20 [Thomas]). As to the remaining noneconomic damage awards (counts 15 [Jeremy], 23 [Justin], and 24 [Bradley]), we conclude the People did not present sufficient evidence to justify the awards. We therefore reverse the entire noneconomic restitution order and remand with directions to hold a restitution hearing to determine appropriate victim-specific damages for counts 15, 23, and 24.

#### 6.1 Proceedings Below

In requesting noneconomic restitution, the prosecutor argued: "Pursuant to *People v. Smith* [(2011) 198 Cal.App.4th 415 (*Smith*)] and the Penal Code, the court is allowed to award restitution to victims in 288 type cases based upon noneconomic damages or it's akin to punitive damages in the amount of at least $50,000 per year of sexual abuse. [¶] The court can make a determination based upon the witnesses' testimony at trial. And this court and this judge heard the testimony of these individuals and based upon their testimony and based upon the abuse and the emotional damage he caused upon those victims, those are the amounts we'd ask for the victims." The defense objected: "I'm not opposed to restitution. I think the law allows for it. However, I think the figures that Mr. [Prosecutor] has given us are arbitrary. We have

39

no foundation for the amounts. So I don't know how he's arrived at those amounts or how the court is going to arrive at an amount, but these are just figures that are thrown out with no basis. [¶] So based upon that, I would object to—not the idea of restitution, but the amounts as proposed."

Then, without further argument or explanation, the court ordered defendant to pay $450,000 in noneconomic restitution. "[B]ased on *People v. Smith*, 198 Cal.App.4th 415, a 2011 case, and Penal Code section 1202.4," the court ordered "the following restitution to the victims as noneconomic damages based on their pain and suffering, and from what the court heard as to their pain and suffering as well as the consideration of statements made on behalf of their family members: [¶] Garrett M., $100,000. Justin B., $50,000. Cory D., $50,000. Ammon C., $50,000. Jeremy S., $50,000. Thomas C., $50,000. Justin B., $50,000. Bradley T., $50,000." In awarding noneconomic damages, the trial court inadvertently omitted Denzel (§ 288.5; count 1), but awarded $50,000 to Justin twice. On April 13, 2015, the court realized its error and corrected it *nunc pro tunc* by deleting the duplicative Justin entry and replacing it with a $50,000 award to Denzel.

### 6.2    Restitution for Noneconomic Losses

Article I, section 28, subdivisions (b)(13)(A)–(C) of the California Constitution require "that restitution must [be] imposed 'in every case . . . in which a crime victim suffers a loss[.]' " (*People v. Giordano* (2007) 42 Cal.4th 644, 655 (*Giordano*).) To implement this broad mandate, " '[t]he Legislature has enacted, and frequently amended, a bewildering array of responsive statutes' " (*id.* at p. 652), but typically, "[a] restitution order reimburses only for economic losses [citation], not noneconomic losses, which can be recoverable in a civil judgment." (*Vigilant Ins. Co. v. Chiu* (2009) 175 Cal.App.4th 438, 445 (*Chiu*).) However, there is one exception. Section 1202.4, subdivision (f)(3)(F) requires trial courts to order restitution where victims have suffered "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." Defendant contends, and the People concede, victims

of continuous sexual abuse are ineligible for noneconomic restitution under this provision. We agree.

The plain language of section 1202.4, subdivision (f)(3)(F) limits noneconomic restitution awards to "felony violations of Section 288." It does not include section 288.5. Defendant was charged with and convicted of continuous sexual abuse of Denzel, Garrett, Cory, Ammon, and Thomas, in violation of section 288.5. He was not charged with or convicted of violating section 288. "Sections 288 and 288.5 are not . . . interchangeable statutes." (*People v. Palmer*, *supra*, 86 Cal.App.4th at p. 445; *see id.* at pp. 443–446 [rejecting argument that One Strike Law's inclusion of section 288 implicitly includes section 288.5].) Therefore, contrary to the prosecutor's representations below, the court was **not** "allowed to award restitution to victims in 288[-]*type* cases." "It is not our job to insert language in a statute which is not there. Had the Legislature wanted to include section 288.5" in the restitution statute, "it was capable of doing so. It did not. The People's remedy lies with the Legislature and that body's power to amend the law, not with us, because we are charged with enforcing statutes as they are written," not as the prosecutor wishes they were written. (*Id.* at p. 446.) We therefore reverse the restitution awards for noneconomic damages to Garrett, Cory, Ammon, and Thomas.[13]

### 6.3 There is no rational basis for the court's $50,000 awards to Jeremy, Justin, and Bradley.

Section 1202.4 does not provide guidelines for evaluating a child victim's noneconomic damages for sexual abuse. Unlike economic damages, which encompass "objectively verifiable monetary losses" (Civ. Code, § 1431.2, subd. (b)(1)), noneconomic damages compensate the victim for "subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and

---

[13] This issue is moot as to Denzel because we reverse defendant's count 1 conviction for insufficient evidence.

41

humiliation." (Civ. Code, § 1431.2, subd. (b)(2); see *Smith*, *supra*, 198 Cal.App.4th at p. 431.) The trial court has broad discretion to choose a method for calculating the amount of restitution, but it must employ a procedure that is rationally designed to determine the victim's losses. (*Giordano*, *supra*, 42 Cal.4th at pp. 663–664.) The court "must demonstrate a rational basis for its award, and ensure that the record is sufficient to permit meaningful review. The burden is on the party seeking restitution to provide an adequate factual basis for the claim." (*Id.* at p. 664.)

Here, the People's sentencing memorandum cited to *Smith* and listed the requested sums, apparently reached by multiplying each victim's years of abuse by $50,000. The People did not submit any support for the figures, or attempt to explain why the same formula should apply to each victim, despite their vastly different experiences. The record contains no victim declarations, independent documentation, or professional evaluations. The only current information about Jeremy, Bradley, and Justin was filtered through their parents and conveyed in the probation report or in a statement at sentencing. None of these statements provided a basis for the court's $50,000 award.

Jeremy's mother told the probation officer she "thanked God her son (victim) did not sustain actual child abuse." She believed that ultimately learning defendant had a sexual interest in him was confusing to Jeremy, and made him feel betrayed and embarrassed. However, Jeremy had not expressed his true feelings or discussed them with his mother. At sentencing, Jeremy's mother suggested Jeremy "will suffer ramifications," from his parents' poor judgment, but did not expand on that belief.

Bradley was "doing fine." The probation officer reported his mother had "not noticed any emotional scars. Thankfully she believes the defendant never committed sexual abuse on him and only hugged him, it may have been nothing inappropriate. He is not attending counseling and [she] believes he has moved on from this." Bradley's father told the probation officer and the court that he did not know how defendant's actions would impact Bradley, but was committed to getting Bradley any help he might need in the future. At sentencing, Bradley's father expressed his own feelings of failure

42

as a parent, and emphasized that Bradley did not need defendant to provide him with a better life.

The probation officer did not speak with Justin's family because the family's contact "information was not provided[,] as it is the District Attorney's desire to afford the victims as much privacy as possible." However, at the sentencing hearing, Justin's mother said her son was "excellent," and defendant had not succeeded in destroying him or their family.

Based on this record, the court's only apparent basis for awarding $50,000 to Jeremy, Bradley, and Justin was the Third District's opinion *Smith*. In that case, after a contested restitution hearing, the trial court ordered the defendant to pay the victim $750,000 as noneconomic restitution for 15 years of abuse—or $50,000 per year. (*Smith*, *supra*, 198 Cal.App.4th at p. 432.) The evidence at trial had established the defendant molested the victim, and the evidence at the restitution hearing proved that from the time the she was eight years old until she left home as an adult, the defendant isolated her and took advantage of a position of trust. (*Ibid*.) Critically, the *Smith* victim also established serious, non-speculative, emotional harm. At age 30, the victim was still having nightmares and flashbacks to the abuse. (*Ibid*.) She had spent years in therapy, could not keep a job, and had still not finished her education at Folsom Lake College; she had twice attempted suicide by overdosing on pills. (*Ibid*.) Based on that evidence, the *Smith* court upheld the $750,000 restitution award. Contrary to the representations of the prosecutor in this case, however, *Smith* did **not** hold that all victims in "288[-]type cases" are entitled to noneconomic restitution of "at least $50,000 per year of sexual abuse." Nor did *Smith* hold that noneconomic damages are "akin to punitive damages." To the contrary, the *Smith* court concluded noneconomic restitution is **not** punishment.

In sum, the court in this case did not find facts, cite reliable evidence, or even explain how it arrived at the amount of restitution awarded to each victim. There was no evidence, either through direct testimony or victim-impact statements, that the children suffered nightmares or flashbacks, that they were having trouble in school or

43

problems making friends, that they had considered harming themselves or others, or that they had sought or received counseling in any form. In fact, all three families were relieved that their sons had not "actually" been abused. Because the court did not "demonstrate a rational basis for its award" or "ensure that the record is sufficient to permit meaningful review," we reverse the awards for counts 15, 23, and 24, and remand with directions to hold a restitution hearing. (*Giordano*, *supra*, 42 Cal.4th at p. 664.)[14]

### 7. Defendant is limited to 15% local conduct credit.

A sentence is unauthorized "where it could not lawfully be imposed under any circumstance in the particular case [such as] . . . where the court violates mandatory provisions governing the length of confinement." (*Scott*, *supra*, 9 Cal.4th at p. 354.) A sentence that awards custody credits exceeding statutory limits is unauthorized, and may be corrected whenever the error is discovered. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8.)

Defendant was awarded 1,241 days of pretrial custody credit—621 days actual credit and 620 days local conduct credit. Under section 2933.1, if the defendant is convicted of a "violent felony" listed in section 667.5, subdivision (c) and is sentenced to state prison, both pre-sentence and post-sentence conduct credits are limited to 15 percent. (§ 2933.1, subd. (c) [15% limit on conduct credits where defendant convicted of a violent felony]; *People v. Ramos* (1996) 50 Cal.App.4th 810, 816–817 [15% limited to largest whole number; no credit for partial days].) Sections 288.5 and 288, subdivision (a) are both violent felonies. (§ 667.5, subds. (c)(6), (16).) Likewise, any defendant "required to register as a sex offender" is excluded from enhanced credit

---

[14]    Because after holding a restitution hearing on remand, the court might not award noneconomic restitution, we do not reach defendant's additional challenges to section 1202.4, subdivision (f)(3)(F), including his constitutional claims. (*People v. Brown* (2003) 31 Cal.4th 518, 534 ["It is well established that we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (internal quotation marks omitted)].)

provisions. (§ 4019, subds. (b)(2), (c)(2); § 2933, subd. (e)(3).) Because, by its terms, section 2933.1 applies to the offender rather than the offense, the statute limits a violent felon's conduct credits for all counts of conviction, regardless of whether every count falls under section 667.5. (*People v. Palacios* (1997) 56 Cal.App.4th 252.) Under section 2933.1, subdivision (c), defendant was entitled to local conduct credit of only 15 percent, and should have been awarded 714 days, rather than 1,241 days, total credit (621 days actual credit + 93 days local conduct credit = 714 days total credit for time served). We are confident the court will correctly recalculate defendant's custody credit upon resentencing. (See *In re Martinez* (2003) 30 Cal.4th 29, 32–37.)

## DISPOSITION

The convictions for counts 1, 5 through 10, and 14 are reversed. Counts 1, 5, 10, and 14 cannot be retried. The matter is remanded for retrial on counts 6 through 9.

The sentences imposed for counts 2 and 12 are vacated. The matter is remanded for resentencing without application of the One Strike Law (§ 667.61).

The order for noneconomic damages (§ 1202.4, subd. (f)(3)(F)) is reversed. The matter is remanded with directions to conduct a restitution hearing to determine noneconomic damage awards, if any, for counts 15, 23, and 24.

In all other respects, the judgment is affirmed.

Upon resentencing, the court is instructed to recalculate defendant's custody credit to reflect no more than 15 percent local conduct credit, amend the abstract of judgment to reflect defendant's new sentence, and forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.


**CERTIFIED FOR PUBLICATION**


LAVIN, J.

WE CONCUR:



EDMON, P. J.                         JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.