Filed 5/17/22  P. v. Perez-Mora CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN JOSE PEREZ-MORA,<br><br>    Defendant and Appellant. | G059349<br><br>(Super. Ct. No. 16NF2169)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Jose Perez-Mora appeals from the judgment after a jury convicted him of two counts of continuous sexual abuse of a child under the age of 14 years, based on evidence he molested two young girls, B.R. (count 1) and A.R. (count 2). The trial court imposed consecutive terms of 15 years to life on each count under Penal Code section 667.61 ("One Strike law") based on the jury's true findings on multiple victim allegations.[1] On appeal, Perez-Mora contends: (1) the trial court abused its discretion by excluding evidence of B.R.'s mental illness; (2) his trial counsel rendered ineffective assistance by failing to object to improper testimony by the prosecution's expert on child sexual abuse accommodation syndrome (CSAAS) concerning the statistical rates of fabricated child sexual abuse claims; (3) the cumulative effect of these errors deprived him of a fair trial; (4) his life sentence under the One Strike law violated ex post facto guarantees; and (5) he was entitled to presentence conduct credits. We conclude the expert's testimony concerning the statistics on fabricated claims of child sexual abuse was inadmissible, but the error was harmless. Finding no other errors, we affirm.

FACTS

I. *General Background*

B.R. and her younger sister A.R. were related to Perez-Mora by marriage. The girls had one older brother, G.R., and two younger brothers. B.R., A.R., and their older brother went to elementary school near Perez-Mora's home. The children were often at his house and sometimes spent the night there.

In 2013, the children's mother separated from their father and she took them to a shelter because they had no place else to live. When they left the shelter, they moved into the Perez-Mora family home and stayed there for a few months.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

## II. *Perez-Mora Sexually Abuses B.R.*

Perez-Mora sexually abused B.R. from the time she was six years old until she was 15. The first incident occurred when B.R. was alone with him in his bedroom. Perez-Mora played a pornographic movie. B.R. fell asleep. When she woke up, Perez-Mora was standing next to the bed and masturbating. He forced her hand onto his penis but let go of it when she would not do what he wanted. During this incident, he groped her breasts and her vaginal area over her clothes.

When she was seven or eight years old, Perez-Mora told her that he needed to show her something and took her into the closet. He closed the door and pulled down his pants, exposing his erect penis. He told her to touch it. When she refused, he grabbed her hand and put it on his penis. He let her go when she continued to resist.

Sometimes when B.R. and her sister spent the night at Perez-Mora's house, they would sleep in the master bedroom with Perez-Mora and his wife. B.R. would sleep on the floor. She would wake up to find Perez-Mora laying behind her with his erect penis pressed against her. He would stop when she moved and he realized she was awake.

If B.R. was alone watching television or on the computer, Perez-Mora would walk up behind her, put his hand down her shirt, and grope her breasts. On one occasion, he kissed her and tried to put his tongue in her mouth.

When B.R. was six to 10 years old, she and her sister would shower together when they were staying at Perez-Mora's house. While they were showering, he would come into the bathroom and act like he was helping them shower and dry off. But he inappropriately touched them while drying them.

Once when B.R. was seven or eight years old, Perez-Mora placed her on his bed after she showered. He put lotion on her and digitally penetrated her. On another occasion, B.R. was sitting on the bed wrapped in a towel when Perez-Mora pulled her to

the edge of the bed, pulled down his pants, and placed his penis on her vaginal area but did not penetrate her.

Perez-Mora attempted to digitally penetrate B.R. when she was 11 years old. He grabbed her and put his hand down her pants. She said "no" louder and louder, hoping her siblings, who were in a nearby room, would hear her. Perez-Mora eventually let her go.

During 10 years of abuse, Perez-Mora had B.R. masturbate him four times, touched her vaginal area three times, touched her breasts under her clothes about four or five times, and touched her breasts and vaginal area over her clothes about 20 times.

When B.R. was 15 years old and her family was staying in the shelter, she told a counselor someone in her family was abusing her. But when a police officer asked her about it, she denied being abused because Perez-Mora and his family were helping her family and staying at his house was the best option for her family.

After leaving the shelter, B.R.'s family stayed at Perez-Mora's house. B.R. and A.R. slept on an L-shaped couch in the living room. One night, Perez-Mora came in and groped B.R.'s breasts. When she shifted, he went over to A.R., pretended to cover her up, and groped A.R.'s buttocks. That night, B.R. told her brother she saw Perez-Mora touching A.R. Her brother did not know what to do about B.R.'s revelation, so he went to their cousins, Perez-Mora's adult children. B.R. told them Perez-Mora was molesting her. Her cousins told her and A.R. to switch rooms with their brothers but did not tell anyone about B.R.'s allegation. B.R. did not want to tell her mother about the abuse because her mother was already going through a lot and B.R. did not want to add to her mother's problems. Perez-Mora was helping the family by giving them a place to stay and B.R. did not want to lose that.

III. *Perez-Mora Sexually Abuses A.R.*

Perez-Mora began abusing A.R. when she was between the ages of seven and nine. Like he did with B.R., Perez-Mora played a pornographic movie when A.R.

4

was alone with him in his bedroom. While the movie was playing, Perez-Mora tried touching A.R.'s breasts and vaginal area over her clothes, but she pushed him away. Referring to the movie, he told her that they could do that when she was ready. He repeatedly did this, and after a few months, he progressed to sucking on her breasts and making her touch his penis.

When A.R. was nine or 10 years old, Perez-Mora followed her into the bathroom, forced her hand onto his exposed penis, and tried to make her masturbate him. She resisted, and he stopped when his daughter called out looking for him.

When A.R. was in the sixth grade, her family attended a party at Perez-Mora's house. A.R. was inside the house, while the others were outside. Perez-Mora came up from behind her and grabbed her breasts. He did this on other occasions when she was alone or no one was paying attention. Sometimes he would come up behind her, put his hands around her waist, and press his penis against her. One time he lifted her shirt and kissed her back.

When A.R. spent the night at Perez-Mora's house, she would wake up to find him touching her vaginal area or her breasts. One of the last incidents occurred when she was sleeping on the couch. Perez-Mora touched her breasts and vagina. She saw Perez-Mora near her sister and her sister woke up crying. Their cousins had them change rooms.

In total, Perez-Mora touched A.R.'s breasts 100 times, touched her vaginal area over her clothes 20 to 30 times, and had her masturbate him five times.

IV. *Disclosure*

In 2016, B.R. disclosed to A.R. that Perez-Mora had molested B.R. when they were younger. A.R. confided in her sister that he had done the same things to her. They told their mother about the abuse. A.R., who was in high school, informed one of her teachers that a man she had been living with sexually abused her and her sister. The teacher, a mandated reporter, reported A.R.'s disclosure.

5

V. *Police Investigation*

Orange County Sheriff's Department Investigators Theresa Pereyra and Investigator Edoardo Arredondo interviewed B.R. in May 2016, when she was 18 years old. She described for them the numerous incidences of abuse Perez-Mora had perpetrated upon her, as detailed above. B.R. told the investigators she had recently learned Perez-Mora also molested A.R. multiple times. Although she saw Perez-Mora grope A.R.'s buttocks in 2013, B.R. thought that was the only time.

After interviewing B.R., Pereyra and Arredondo interviewed A.R., who was 14 years old at the time. A.R. described several acts of abuse Perez-Mora had perpetrated upon her over the years.

A. *Pretext Phone Call*

A few months after law enforcement interviewed B.R., they had her make a pretext phone call to Perez-Mora. In the call, B.R. said she wanted to talk to him about him touching her when she was six years old and asked if he remembered touching her breasts. He said he touched her one time when he was waking her up for school and he told her to talk to her mother because "it wasn't normal." He denied B.R.'s accusations of sexual abuse.

B. *Police Interview*

Perez-Mora was arrested minutes after the pretext phone call and transported to the Orange County Sheriff's Department, where he was interviewed by Pereyra and Arredondo. In the interview, Perez-Mora repeatedly denied anything inappropriate happening with the girls. He said his wife and daughter, not him, helped the girls bathe and dress. And he claimed he was never home alone with the girls.

Talking about his statement during the pretext call that he touched B.R.'s breast, Perez-Mora stated he accidentally touched her chest once when he went to wake her up. He felt a hard bump by her chest and told her to tell her mother about it because he thought it was abnormal and could be an infection.

6

VI. *Charges*

In a second amended information, Perez-Mora was charged with two counts of continuous sexual abuse of a child under the age of 14 years (§ 288.5, subd. (a).) Count 1 alleged continuous sexual abuse of B.R. on or about and between February 16, 2003 and February 15, 2012, and count 2 alleged continuous sexual abuse of A.R. on or about and between June 16, 2008 and June 12, 2015. As to both counts, it was alleged under the One Strike law that Perez-Mora committed a designated offense against more than one victim. (§ 667.61, subds. (b), (e)(4).)

VII. *Trial*

A. *Prosecution Evidence*

1. *B.R.'s Testimony*

B.R. was 22 years old at the time of trial. For the most part, her testimony regarding the sexual abuse was consistent with her statement to the investigators in 2016. However, at trial she testified the first time Perez-Mora abused her was the incident where he took her into the closet, exposed his erect penis, told her to touch it, and put her hand on it. She testified Perez-Mora twice made her watch pornographic movies with him but she did not recall any inappropriate touching on these occasions.

In her testimony, B.R. described Perez-Mora inappropriately touching them when they were showering at his house. She also described two incidents occurring when she was between the ages of six and 10, where Perez-Mora digitally penetrated her after she got out of the shower.

She testified that when she was seven or eight years old, Perez-Mora touched her vaginal area with his penis on two occasions; she had only told investigators about one incident. She testified that when she was nine years old or older, Perez-Mora kissed her on the lips and asked if she wanted to be his girlfriend.

7

2. *A.R.'s Testimony*

A.R. was 19 years old at the time of trial. For the most part, her testimony regarding the sexual abuse was consistent with her statement to the investigators in 2016. However, at trial she testified the first incident of abuse occurred in the middle of the night when she woke up to find Perez-Mora touching her breasts and vaginal area. At the time, she was sleeping in the bed with Perez-Mora's wife and he was sleeping on the floor next to the bed. A.R. confirmed her and her sister showered together at Perez-Mora's house when they were young, but A.R. did not remember Perez-Mora touching B.R.'s chest in the shower.

3. *Expert Testimony Concerning CSAAS*

Dr. Martha Rogers, a clinical and forensic psychologist, received training on the treatment of child molestation victims, taught classes on the subject, and published articles about it. She had done "quite a bit of work on mistaken or fabricated allegations." Rogers explained CSAAS was developed by a doctor in 1983 based on his clinical observations of sexually abused children. In the article, he sought to identify some of the dynamics between these children and their abusers and described five characteristics he thought were commonly seen in sexually abused children: (1) secrecy; (2) helplessness; (3) entrapment; (4) delayed disclosure; and (5) retraction or recantation.

Rogers described each of the five characteristics and cautioned they should not be used to determine whether abuse occurred. She indicated secrecy refers to the fact the sexual abuse occurs when the abuser is alone with the child, and children tend to keep the abuse a secret for various reasons. Helplessness has to do with the power differential between the perpetrator and the child, especially if the abuser is a family member, because the adult has certain controls over the child and the child is helpless to oppose what is happening. Entrapment concerns a child's inability to get out of an abusive situation.

8

Rogers addressed delayed and unconvincing disclosure, indicating it was the most widely researched area of CSAAS. She explained delayed disclosures are very common with children who have been sexually abused. In a child's initial disclosure, the child may reveal only a portion of what happened. How much a child discloses depends on the child's relationship with the person to whom the child is making the disclosure and the person's reaction.

Discussing retraction, Rogers stated research shows retraction may occur when the abuser is a family member and the child becomes concerned about what the disclosure will do to the family. A child's desire not to breakup the family can cause the child to recant or deny an abuse allegation. In some cases, the child will recant but later restate the abuse allegation. Rogers testified studies about victims recanting or retracting indicate rates of retraction are not as high as failure to disclose and recantation is more common in familial abuse situations.

Rogers clarified CSAAS is not a tool to say whether abuse happened, but it can be used to look at the conduct of someone who has been abused and understand why they acted as they did. It cannot be used to diagnose or prove someone did something. She also testified just because a child displays one or more of CSAAS's five characteristics does not mean the child was sexually abused. Rogers had not reviewed any information about the case and knew nothing about the victims.

Rogers testified that in the studies she had examined, the rates of children fabricating allegations of sexual abuse was "very low" and "[t]he biggest studies [gave] a rate of five to ten percent of either young children where we say mistaken allegations have occurred and a small percentage of fabricated cases." She stated that in her own experience, "fabricated cases were largely in family law court, rather than in a criminal venue."

B. *Defense evidence*

1. *Perez-Mora's Testimony*

Perez-Mora testified in his own defense and denied all of B.R.'s and A.R.'s allegations of inappropriate touching. During the time the alleged abuse occurred (from 2005 through 2013), he routinely worked 14 to 15 hours a day. When he had a day off, he was never home alone with the girls.

2. *Testimony of Perez-Mora's Family and Friends*

Perez-Mora's wife, daughter, and son testified in his defense. All of them lived in the house between 2005 and 2013, and none of them saw any inappropriate interactions between Perez-Mora and the girls. Each confirmed Perez-Mora worked long hours and was rarely home. None of them believed Perez-Mora was ever home alone with the girls because someone in the family was always home when the girls were there. Perez-Mora's son and daughter denied anyone told them B.R. saw their father touch A.R. inappropriately.

Perez-Mora's adult daughter testified B.R. and A.R. only spent the night between 2005 and 2010 if she was home because she was responsible for watching them. She would help the girls with their baths or showers. Perez-Mora's wife and daughter never saw him interact with the girls while they were bathing or put lotion on them after they got out.

Perez-Mora's wife and daughter confirmed that when B.R. and A.R. were young, the girls slept in the master bedroom with Perez-Mora and his wife, and the girls usually on the floor. Sometimes they slept in the bed with Perez-Mora's wife; when they did, Perez-Mora slept on the floor. Perez-Mora's wife was a light sleeper and got up multiple times during the night to use the restroom; she never saw anything inappropriate between Perez-Mora and the girls.

From time-to-time, extended family members lived in the house with Perez-Mora and his immediate family. Two separate family members testified they lived

10

in the house, one for about three weeks and the other about three years, and they never observed anything inappropriate between Perez-Mora and the girls.

Perez-Mora's wife saw B.R. and A.R. interact as they were growing up. B.R. bullied A.R., and it appeared A.R. was afraid of B.R. A woman who had been in a relationship with the girls' father for more than nine years testified she had seen B.R. lie and manipulate her siblings.

3. *Other Defense Evidence*

In 2013, a shelter counselor conducted therapy sessions with B.R. During a session, B.R. disclosed she was being sexually abused by a family member on her father's side, but she did not name the person. B.R. informed the counselor she told a cousin about the abuse and her parents knew about it but did nothing.

In April 2013, Chino Police Officer Alexander Nobel interviewed B.R. about her sexual abuse allegation. She told him she was not sexually assaulted. Although B.R.'s denial contradicted the counselor's report, Nobel believed B.R. Based on her demeanor and their conversation, he concluded the allegation of sexual abuse was unfounded.

VIII. *Verdict and Sentencing*

A jury found Perez-Mora guilty of both counts of continuous sexual abuse and found true the multiple victim allegations. At sentencing, the court imposed consecutive terms of 15 years to life on each count pursuant to the One Strike law, for a total sentence of 30 years to life. The trial court gave Perez-Mora credit for presentence time spent in custody but no conduct credits.

DISCUSSION

I. *Exclusion of Evidence*

Perez-Mora contends the trial court abused its discretion by excluding evidence of B.R.'s mental illness. He asserts this evidence was relevant impeachment

11

evidence and its exclusion violated his federal constitutional rights to confrontation and to present a complete defense. We review the court's evidentiary ruling for an abuse of discretion and finding none, we reject this contention.

A. *Background*

B.R. testified she told a therapist or social worker in 2013 she had been molested by someone in her family, but she did not name her abuser. She was subsequently interviewed by Nobel about the allegation and denied being abused. At trial, B.R. gave two reasons why she denied being abused when she talked to Nobel. One, her mother "was already under a lot of stress, being homeless, having no job, and five kids to support" and B.R. did not want to add to this. Two, she believed if the police found out Perez-Mora was abusing her, her family would be homeless because they could not stay at the shelter much longer and his house was the only place they could stay.

On cross-examination, defense counsel asked B.R. if she was hearing voices when she talked to Nobel, but the court sustained the prosecutor's relevancy objection. Defense counsel next asked B.R. if she told the officer she was hearing voices and would act on those voices. The court again sustained the prosecution's relevancy objection. Then, defense counsel questioned B.R. if she made any statements to the officer about her mental health issues. The prosecutor objected again, and the court sustained the objection, rejecting the defense argument it went to "bias and motive." B.R. testified she lied when she told Nobel she was not being abused. When B.R. completed her testimony, she was excused subject to recall.

Before testimony resumed the next day, defense counsel filed a motion in limine to permit the questioning of B.R. about statements she made to Nobel when he was investigating her sexual abuse allegation. In the motion, defense counsel made the following offer of proof, as relevant here: (1) When talking to Nobel, B.R. denied telling "her therapist that 'someone' was trying to touch her" and said "'something'" was; and (2) She said she heard voices and sometimes acted on what the voices told her. Defense

12

counsel argued B.R.'s denial of being sexually abused and the inference "that voices in her head caused her to make these allegations" were relevant to her credibility and impeachment and therefore the evidence was admissible under Evidence Code section 780. Defense counsel asserted B.R. "offered the statements about hearing voices and acting on what the voices say as an explanation for making the accusation of sexual assault . . . ."

At a hearing on the motion, defense counsel stated he wanted to recall B.R. and question her about her statement to Nobel that she heard voices and sometimes acts on them. Defense counsel asserted the evidence was relevant to show why B.R. recanted the 2013 allegation and to rebut the CSAAS expert's testimony explaining why children recant abuse allegations. The prosecutor argued any statements B.R. made about mental health issues and hearing voices were irrelevant and should be excluded under Evidence Code section 352. The prosecutor also objected to the meaning the defense placed on B.R.'s statements. The prosecutor argued Nobel's report did not indicate B.R. said she made the sexual abuse report because she heard voices or that voices told her to do so. Although the court was unconvinced the evidence was relevant, it agreed to review a copy of the police report before making a final ruling.

Once the prosecution rested, the court addressed the matter again. After further argument, the parties agreed an Evidence Code section 402 hearing would be beneficial.

The court conducted the hearing the next day. Nobel testified he had no independent memory of his conversation with B.R. and was relying on his report. When he talked to B.R., she told him she was not sexually assaulted. She also said she heard voices, saw things, and acted upon them. Nobel was unable to verify defense counsel's assertion the voices caused her to make the abuse allegation, and Nobel was unsure the context in which B.R. made the statement about hearing voices.

13

After Nobel's testimony at the hearing, defense counsel repeated his argument B.R.'s statements were relevant to her credibility. Defense counsel asserted the evidence B.R. heard voices that influenced her actions provided an alternative theory to the prosecution's CSAAS expert's testimony regarding recanting. The court responded the defense theory was "all speculation." The court ruled the defense could use Nobel's testimony to show B.R. denied being sexually molested when asked about it in 2013. But the court excluded "[a]nything about voices" because any suggestion they affected her in reporting the abuse was unsupported speculation.

B. *Applicable Law*

Evidence bearing on a witness's credibility is generally relevant and admissible. (Evid. Code, §§ 210, 350.) Evidence Code section 780 addresses evidence the trier of fact may consider in evaluating a witness's credibility. It states that in determining the credibility of a witness, the trier of fact may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony at the hearing, including" the extent of the witness's "capacity to perceive, to recollect, or to communicate any matter about which [she] testifies" (Evid. Code, § 780, subd. (c)), or her "opportunity to perceive any matter about which [she] testifies" (*id.*, subd. (d)). (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072 (*Herring*).)

Evidence a witness has a mental health issue may be relevant to the witness's credibility but is not automatically admissible. (*People v. Anderson* (2001) 25 Cal.4th 543, 579.) Our Supreme Court has explained, "'[t]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question.' [Citation.]" (*People v. Samuels* (2005) 36 Cal.4th 96, 116 (*Samuels*).) But a trial court may properly exclude evidence of a witness's mental illness if there is no showing it affects her powers of perception, communication, memory, or recollection. (*Herring, supra*, 20 Cal.App.4th at p. 1072.)

14

Even if a court finds evidence of a witness's mental health relevant, the evidence may nonetheless be excluded under Evidence Code section 352 "if the court determines its prejudicial impact substantially outweighs any probative value. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 558.) "We afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative. [Citations.]" (*Ibid.*) A trial court's admissibility determination will not be reversed on appeal unless the defendant demonstrates "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . .' [Citations.]" (*People v. Hartsch* (2010) 49 Cal.4th 472, 497; Evid. Code, § 354.)

C. *Analysis*

We discern no abuse of the trial court's discretion. The court permitted the defense to present evidence (1) B.R. told Nobel she was not sexually assaulted; (2) her therapist's report otherwise was not true; and (3) Nobel concluded B.R.'s allegations of sexual abuse were unfounded. The court's exclusion of evidence B.R. heard voices and acted upon them was not arbitrary, capricious, or patently absurd.

As he did in the trial court, Perez-Mora contends B.R. told Nobel she was recanting her abuse allegation because she heard voices and acted upon them. We agree with the trial court this theory is not supported by the evidence and is speculative. No correlation was established between B.R.'s 2013 sexual abuse allegation, her recanting of this allegation, and her self-reported behavior of hearing voices and acting upon them. The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion. [Citation.]" (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

Perez-Mora presented no evidence B.R.'s mental health issues, assuming she actually had any, affected her perceptions, understanding, memory, or ability to recall or communicate. He simply failed to establish the necessary link between any mental health issues B.R. may have suffered from in 2013 and (1) her ability to perceive the

15

events that occurred when she was younger or (2) her ability to accurately recall or describe those events at trial in 2020. (*Samuels, supra*, 36 Cal.4th at p. 116.) Thus, we conclude the trial court did not abuse its discretion by excluding evidence of B.R.'s statements to Nobel suggesting she had mental health issues in 2013.

II. *Ineffective Assistance of Counsel*

Perez-Mora contends his trial counsel rendered ineffective assistance by "failing to object and request an admonition when the prosecution presented improper opinion testimony on the credibility of the complainants." (Boldface & capitalization omitted.) Specifically, he is referring to a portion of Rogers's testimony concerning the statistical rates of fabricated child sexual abuse claims. We agree trial counsel should have objected to this testimony but conclude counsel's deficient performance was not prejudicial.

A. *Background*

The prosecution presented Rogers as an expert on CSAAS, and on direct examination, she discussed its five components, which included retraction and recantation. Rogers testified she had done "quite a bit of work on mistaken or fabricated allegations."

On cross-examination, defense counsel asked Rogers to discuss her experience with fabricated abuse allegations. Rogers stated the research indicated the vast majority of mistaken abuse allegations were in children five years old and younger and the majority of fabricated incidents occurred with older children, particularly adolescents, and usually occurred because there was something in the child's environment the child wanted to change or prevent from being changed. Defense counsel asked whether a child's mental health issues would affect the child's ability to recall or desire to fabricate. Rogers answered mental health issues could affect the child's ability to recall but the fabrication usually had to do with "situational variables in the child's life" and not mental illness.

16

On redirect, the prosecutor returned to the issue of fabrication and asked Rogers "[w]hat are the rates, in the studies you've examined on child fabrication, as to what amount of children fabricate allegations of sexual abuse?" Rogers responded: "It's very low. The biggest studies give a rate of five to ten percent of either young children where we say mistaken allegations have occurred and a small percentage of fabricated cases. In my own experience, fabricated cases were largely in family law court, rather than in a criminal venue." The prosecutor inquired whether "that five to ten percent" included "custody battle[s] or some sort of splitting of the family unit," and Rogers responded affirmatively. Defense counsel did not object to this portion of Rogers's testimony.

B. *Applicable Law*

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216.) To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 104.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.)

A review of recent case authority reveals trial counsel's failure to object to Rogers's testimony concerning the statistical rates of fabricated child sexual abuse claims constituted deficient performance. Prior to Perez-Mora's trial, two Courts of Appeal held expert testimony that purports to quantify the prevalence of false allegations of child sexual abuse is irrelevant and more prejudicial than probative—*People v. Wilson* (2019)

17

33 Cal.App.5th 559 (*Wilson*) and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*). While this appeal was pending, we similarly concluded in *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*) the admission of expert testimony that it was "rare" for children to make false allegations of sexual abuse was error but harmless. (*Id.* at p. 166.)

In *Julian*, the prosecution's CSAAS expert testified, "false allegations of sexual abuse by children 'don't happen very often.' 'The range of false allegations that are known to law enforcement or [Child Protective Services] . . . *is about as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.'" (*Julian, supra*, 34 Cal.App.5th at p. 885.) After reviewing cases from other jurisdictions, the Court of Appeal concluded the expert's statistical evidence on false allegations was inadmissible CSAAS evidence. (*Id.* at pp. 886, 887.) The *Julian* court discussed the dangers of an expert offering "'predictive conclusions,'" stating "[w]here expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence. [Citation.]" (*Id.* at p. 886.) Addressing the situation before it, the Court of Appeal indicated the jury had to decide between the credibility of one of the victims and defendant but the expert's "92 to 99 percent probability evidence invited jurors to presume [defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case. [Citation.]" (*Ibid.*) The *Julian* court found defense counsel was ineffective for failing to object to the expert's improper statistical testimony concerning false allegations. (*Id.* at pp. 887-888.)

In *Wilson*, the same expert who testified in *Julian* testified false allegations of child sexual abuse "occur 'very infrequently or rarely,' most often during a child custody dispute." (*Wilson, supra*, 33 Cal.App.5th at p. 568.) The expert continued: "'There are a number of studies that talk about the pressures put on children to make a false allegation.'" (*Ibid.*) He then "referred to a 'classic' Canadian study that found

'about 4% of cases in which there was an allegation that was determined to be false,' remarking that '[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else,' such as a parent disputing custody." (*Ibid.*) On cross-examination, the expert testified there were multiple studies on the subject, "which found false allegations in between 1 and 6 percent of cases." (*Ibid.*) On appeal, defendant asserted the statistical evidence "improperly amounted to testimony that 96 percent (or between 94 and 99 percent) of children accusing a person of child molestation were telling the truth" and this evidence "invaded the province of the jury in assessing a complaining witness's credibility." (*Ibid.*)

The *Wilson* court reviewed authority from sister states, federal, and military courts before concluding the weight of this authority held expert testimony concerning the rate of false allegations of child sexual abuse was inadmissible, and the *Wilson* court found the reasoning of these cases compelling. (*Wilson, supra*, 33 Cal.App.5th at pp. 568-570.) Addressing the facts before it, the Court of Appeal indicated the expert's "testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although [the expert's] testimony on this point was not expressly directed to [either of defendant's victims], the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' [Citations.]" (*Id.* at p. 570.) Explaining its concerns about the evidence, the *Wilson* court stated: "Even assuming one could determine that only 1 to 6 percent of sexual abuse allegations are false, that fact would not be helpful to the jury because it tells the jury nothing about whether *this particular allegation* is false. Are [the victims] in the 4 percent or in the 96 percent? The jury must evaluate their testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt. [Citations.]" (*Id.* at

p. 571.)  The Court of Appeal concluded the trial court abused its discretion by admitting the expert's statistical evidence testimony because it was irrelevant and more prejudicial than probative.  (*Ibid.*)

We found the reasoning in *Julian* and *Wilson* persuasive when we addressed similar facts in *Lapenias, supra*, 67 Cal.App.5th at pages 178 to 179.  In *Lapenias*, a juror submitted a written question asking whether it was common for children to make up a false allegation of abuse.  The trial court permitted the prosecution's CSAAS expert to respond it was "'rare for kids to make a false claim of sexual abuse.'"  (*Id.* at p. 177.)  We held this testimony by the expert was inadmissible and the trial court erred by failing to sustain the defense objection to it.  (*Id.* at p. 179.)  Explaining our reasoning, we stated:  "Although [the expert] knew nothing about [the victim] and the facts of this case, his testimony—by implication and by inference— violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty.  [Citation.]  Further, applying *Julian* and *Wilson*, we find [the expert's] answer went considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed reporting).  Rather, the juror's question—and [the expert's] response— "'addressed whether children who claimed to be sexually assaulted lie.  [The] testimony did not aid, but supplanted, the jury in its decision on whether"' [the victim's] testimony was credible.  [Citation.]"  (*Ibid.*)

Based on the analyses in *Julian*, *Wilson*, and *Lapenias*, we conclude Rogers's testimony concerning the statistics on false claims of child sexual abuse was inadmissible.  Because the decisions in *Julian* and *Wilson* were published prior to Perez-Mora's trial in 2020, we conclude trial counsel's failure to object to this inadmissible evidence constituted deficient performance.

Next, we address whether counsel's deficient performance was prejudicial.  In *Julian*, the Court of Appeal found the admission of the statistical information was

20

prejudicial because the jury was "bombarded with it." (*Julian, supra*, 34 Cal.App.5th at p. 888.) However, in *Wilson, supra*, 33 Cal.App.5th at page 572, the Court of Appeal found the evidence harmless, as did we in *Lapenias, supra*, 67 Cal.App.5th at page 180. Perez-Mora contends his case is indistinguishable from *Julian* and therefore we must find the error prejudicial. The Attorney General argues the error was harmless because it is not reasonably probable Perez-Mora would have enjoyed a more favorable outcome in the absence of the error. We agree with the Attorney General.

Rogers's testimony concerning the statistics on false allegations of child sexual abuse was brief. This is in contrast to the situation in *Julian*, where "the jury was bombarded with it." (*Julian, supra*, 34 Cal.App.5th at p. 888.)

During their closing arguments, both counsel discussed Rogers's testimony concerning false allegations. However, we find the prosecutor's argument somewhat troubling. The prosecutor argued to the jury: "[Rogers] said the rates of false allegations of child sexual abuse are very low. And of the ones that are false, most of them are because they are super young children who don't understand what's going on, misunderstand an act. [¶] The only times there are false allegations is when two parents are going through a divorce and one kid makes up an allegation against the parent during that custody battle. There's no custody battle here." The prosecutor's statement that false allegations *only* occur during custody battles misrepresented Rogers's testimony. Although concerning, we conclude the prosecutor's argument does not weigh in favor of prejudicial error. In the overall context of the prosecutor's argument, this reference to the evidence on false allegations of child sexual abuse was brief. And, the court instructed the jury nothing the attorneys say during closing arguments is evidence. (CALCRIM No. 222.)

Moreover, the court instructed the jury on consideration of CSAAS evidence and expert testimony. Regarding the CSAAS testimony, the court read CALCRIM No. 1193, which stated: "[Rogers's] testimony about child sexual abuse

21

accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him." (CALCRIM No. 1193.) The jurors were also instructed they were not bound by the expert's opinion (CALCRIM No. 332), and they were the sole judges of the "credibility or believability of the witnesses" (CALCRIM No. 226). "We presume the jurors understood and followed the instructions. [Citations.]" (*Lapenias, supra*, 67 Cal.App.5th at p. 180.)

Further, the evidence of Perez-Mora's guilt was overwhelming. Both B.R. and A.R. described similar acts of abuse beginning when they were around six or seven years old and continuing for years. In 2013, B.R. told her older brother G.R. she had seen Perez-Mora inappropriately touch A.R., a fact G.R. corroborated. G.R. also testified one night when he was pretending to be asleep, he saw Perez-Mora massage A.R.'s back. Although there were some discrepancies between the girls' initial statements to law enforcement in 2016 and their trial testimony, there were no serious inconsistencies.

Thus, we reject Perez-Mora's claim of ineffective assistance of counsel as we conclude it is not reasonably probable he would have enjoyed a more favorable result if his counsel had objected to the improper testimony concerning the statistics on fabricated allegations of child sexual abuse. (*Strickland, supra*, 466 U.S. at pp. 693-694.)

III. *Cumulative Prejudice*

Perez-Mora contends the cumulative prejudice of the exclusion of the defense evidence concerning B.R.'s mental illness and the admission of the improper expert testimony concerning rates of false claims of child sexual abuse deprived him of his constitutional rights to a fair trial. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) As we have only found one error and concluded it was harmless, the theory of cumulative prejudice does not apply.

IV.  *Ex Post Facto*

The prosecution charged Perez-Mora with the continuous sexual abuse (§ 288.5) of B.R. on or about and between February 16, 2003 and February 15, 2012 (count 1), and the continuous sexual abuse of A.R. on or about and between June 16, 2008 and June 12, 2015 (count 2).  After the jury convicted Perez-Mora of both counts and found true multiple victim enhancements (§ 667.61, subd. (e)(4)), the court imposed indeterminate sentences of 15 years to life on each count under the One Strike law.

Perez-Mora contends his indeterminate sentences under the One Strike law violate the ex post facto clauses of the federal and state Constitutions because section 288.5 was not included in the One Strike law until September 2006 and it cannot be determined whether the jury relied on at least one act occurring after this date in convicting him of count 1.[2]  While we conclude the jury should have been instructed to determine whether one of the acts of continuous sexual abuse in count 1 occurred after the 2006 amendment to the One Strike law, we conclude the error was harmless, and therefore, there was no violation of the state and federal ex post facto clauses.

A.  *Constitutional Prohibition Against Ex Post Facto Laws*

Both the United States Constitution and the California Constitution prohibit ex post facto laws.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)  "Under both Constitutions, '[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts.'  [Citations.]" (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1173 (*Valenti*).)  We interpret the California Constitution's ex post facto clause "no differently than its federal counterpart.  [Citations.]"  (*People v. Snook* (1997) 16 Cal.4th 1210, 1220.)

---

[2]  Perez-Mora does not contend there is an ex post facto violation as to count 2, as all of the acts of abuse involving A.R. occurred after the September 2006 amendment to the One Strike law.

23

B. *Application of Ex Post Facto Principles to Sections 288.5 and 667.61*

Section 288.5 punishes a continuous course of conduct. Subdivision (a) of section 288.5 provides: "Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."

The ex post facto issue here is the amendment to the One Strike law in September 2006 to include a conviction for continuous sexual abuse of a child. "Enacted in 1994, California's One Strike law, section 667.61, requires indeterminate life sentences for enumerated sex offenses committed under certain aggravating circumstances. [Citation.] Effective September 20, 2006, the One Strike law was amended to apply to defendants convicted of continuous sexual abuse of a child (§ 288.5). [Citation.] However, before 2006, section 288.5 was not a One Strike offense. [Citations.] The indeterminate life sentences now prescribed by section 667.61 greatly exceed the determinate sentences of 6, 12, or 16 years previously available for violations of section 288.5. Thus, the ex post facto clause prohibits sentencing defendants under the One Strike law for section 288.5 violations committed before September 20, 2006. [Citation.]" (*Valenti, supra*, 243 Cal.App.4th at p. 1174, fn. omitted.)

In *People v. Grant* (1999) 20 Cal.4th 150 (*Grant*), our Supreme Court considered whether a conviction for continuous sexual abuse violated constitutional provisions prohibiting ex post facto laws when the conviction was based on sexual abuse that began before the enactment of section 288.5 and continued after its effective date (*id.*

at p. 153), calling this a "'straddle' offense" (*id.* at p. 159). The California Supreme Court explained: "In general, application of a law is retroactive only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was *completed* before the law's effective date. [Citations.] Thus, the critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date. [Citations.]" (*Id.* at p. 157.) The *Grant* court concluded section 288.5 constitutionally could be applied to "continuing sexual abuse of a child that began before, but continued after, the statute's enactment . . . ." (*Id.* at p. 159.) The Supreme Court found on point *People v. Palacios* (1997) 56 Cal.App.4th 252 and quoting from it stated: "'A continuous course of conduct offense cannot logically be "completed" until the last requisite act is performed. Where an offense is of a continuing nature, and the conduct continues after the enactment of a statute, that statute may be applied without violating the ex post facto prohibition.' [Citation.]" (*Grant, supra*, 20 Cal.4th at p. 159.)

It logically follows from *Grant* that a defendant may be sentenced under a statutory amendment increasing the punishment associated with a crime based on conduct that occurred before and continued after the amendment's effective date, without violating provisions in the state and federal Constitutions prohibiting ex post facto laws. (*Valenti, supra*, 243 Cal.App.4th at p. 1176.)

C. *Analysis*

The issue before us is whether Perez-Mora's indeterminate sentences under the One Strike law violate constitutional provisions prohibiting ex post facto laws when his conviction in count 1 was based on sexual abuse that began before and continued after the One Strike law's amendment in 2006. Our analysis is guided by *Grant, supra*, 20 Cal.4th 150 and *Valenti, supra*, 243 Cal.App.4th 1140.

In *Grant*, the trial court instructed the jury it could only convict defendant of continuous sexual abuse if it "found that one of the required minimum of three acts of

25

molestation occurred after section 288.5's effective date." (*Grant, supra*, 20 Cal.4th at pp. 157-158.) The Supreme Court explained, "defendant could be convicted only if the course of conduct constituting the offense of continuous sexual abuse was completed after the new law became effective." (*Id.* at p. 159.)

Unlike the situation in *Grant*, our jury was not instructed it had to find at least one act of abuse occurred after the 2006 amendment to the One Strike law. Thus, this is where we part company with *Grant* and turn to *Valenti, supra*, 243 Cal.App.4th 1140.

In *Valenti*, like here, defendant contended his indeterminate sentences under the One Strike law violated the ex post facto clause because the continuous sexual abuse began before the 2006 amendment to the One Strike law and the jury was not instructed it must find least one act of abuse occurred after the amendment. (*Valenti, supra*, 243 Cal.App.4th at pp. 1175-1176.) The *Valenti* court concluded this was error because "[u]nder *Apprendi*,[3] *Blakely*,[4] and *Alleyne*,[5] any fact that increases a defendant's minimum or maximum sentence is an element of the offense that must be submitted to the jury. [Citation.]" (*Id*. at p. 1176.) The Court of Appeal indicated defendant was only eligible for One Strike sentencing if the continuous sexual abuse of the victims continued beyond the effective date of the 2006 amendment, otherwise defendant's indeterminate sentence violated the ex post facto clause. (*Ibid.*) The *Valenti* court explained: "Because the date of the last act of sexual abuse increased defendant's mandatory minimum and maximum sentences, the date was an element of each charged crime. The court's failure to instruct that at least one instance of sexual abuse had to occur on or after September 20, 2006, therefore, is federal constitutional error comparable to the omission of an element . . . ." (*Ibid.*)

---

3          *Apprendi v. New Jersey* (2000) 530 U.S. 466
4          *Blakely v. Washington* (2004) 542 U.S. 296
5          *Alleyne v. United States* (2013) 570 U.S. 99

Here, as in *Valenti*, Perez-Mora was only eligible for One Strike sentencing if the continuous sexual abuse of B.R. continued beyond September 2006, when section 288.5 was added to the One Strike law. Thus, the jury should have been instructed to determine whether one of the acts of molestation Perez-Mora perpetrated on B.R. occurred after September 2006. The failure to instruct the jury on this element of the multiple victim allegation for count 1 was federal constitutional error.

Federal constitutional errors are assessed under *Chapman v. California, supra*, 386 U.S. at page 24. (*Valenti, supra*, 243 Cal.App.4th at p. 1165.) "Under *Chapman*, we must reverse unless the People 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] Where the trial court fails to instruct on an element of the charged offense, however, the People must make a more substantial showing. That showing is governed by *Neder v. United States* (1999) 527 U.S. 1, 17-19 (*Neder*), and by" *People v. Mil* (2012) 53 Cal.4th 400 (*Mil*), the California Supreme Court's decision interpreting *Neder*. (*Valenti, supra*, 243 Cal.App.4th at pp. 1165-1166.)

In *Mil*, the California Supreme Court stated: "*Neder* instructs us to 'conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' [Citation.] On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.]" (*Mil, supra*, 53 Cal.4th at p. 417.) In assessing prejudice from instructional error, "[o]ur task . . . is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' [Citations.]" (*Ibid.*) In other words, "the failure to instruct on an element of the offense is harmless if the People prove beyond a

27

reasonable doubt that no substantial evidence supports a contrary finding on the omitted element. [Citations.]" (*Valenti, supra*, 243 Cal.App.4th at pp. 1176-1177, citing *Mil, supra*, 53 Cal.4th at pp. 417-419.)

In analyzing the prejudice from the instructional error here, our task is to determine whether any rational fact finder could have concluded Perez-Mora did not abuse B.R. after September 20, 2006. (See *Mil, supra*, 53 Cal.4th at p. 418 ["our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the *opposite* conclusion"].) Because a rational fact finder could not, we conclude the error is harmless beyond a reasonable doubt.

B.R. testified Perez-Mora began molesting her when she was six years old, which would have been between February 2003 to February 2004, and the abuse continued until she was over the age of 14, which would have been in February 2013. As discussed above, the pertinent amendment to section 667.61 took effect in September 2006, when B.R. was eight years old. B.R. described several acts of sexual abuse that could have occurred before and after the 2006 amendment. More than 10 times when she was between the ages of six and 11, Perez-Mora would lay behind her on the bedroom floor, grope her breasts, and push his erect penis against her buttocks. About 20 times when she was between the ages of six and 10, Perez-Mora came into the bathroom while B.R. was showering and touched her breasts. When she was between the ages of six and 11, Perez-Mora touched B.R.'s vaginal area both over and under her clothes eight times total.

But B.R. also testified to specific incidents that occurred after September 2006. When she was nine years old or older, Perez-Mora kissed her on the lips and asked if she wanted to be his girlfriend. B.R. also testified about an incident that occurred when she was 11 years old. During that incident, Perez-Mora grabbed her from behind, put one arm around her chest, and with his other hand reached down her pants and inside her underwear.

28

Although Perez-Mora denied touching B.R. inappropriately, he did not contest the dates of the abuse. Perez-Mora presented a general denial of the abuse, but he did not contest the omitted element that at least one act of abuse occurred after September 2006. We see no rational way the jury could have concluded Perez-Mora committed only the acts of abuse occurring prior to September 2006. No evidence suggested he completed the crime of continuous sexual abuse of B.R. before September 2006. Thus, we conclude beyond a reasonable doubt the evidence showing Perez-Mora molested B.R. after September 2006 "'was uncontested and supported by overwhelming evidence.' [Citations.]" (*Mil, supra*, 53 Cal.4th at p. 417.) Application of the One Strike law to Perez-Mora did not violate the ex post facto clauses of the federal and state Constitutions.[6]

V. *Custody Credits*

Perez-Mora contends the trial court erred by failing to award him any conduct credits. We disagree. Under the One Strike law, Perez-Mora is not entitled to presentence conduct credits. (*People v. Adams* (2018) 28 Cal.App.5th 170, 182; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267.)

---

[6] Although we reject Perez-Mora's ex post facto claim, we remind the district attorney "[a] statute's effective date is not a mere technicality; it is fundamental to due process." (*Valenti, supra*, 243 Cal.App.4th at p. 1174, fn.10.)

29

## DISPOSITION

The judgment is affirmed.



                                                   O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.